IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL LAWRENCE LOMBARDO,           Case No. 2:24-cv-01711-KBH

         Plaintiff,

v.

CHRISTOPHER BRYAN LEONARD and
IMS TECHNOLOGY SERVICES, INC.,

         Defendants.

## AMENDED COMPLAINT

### I.  Introduction

The Plaintiff brings this action against Defendant Christopher Bryan Leonard ("Mr. Leonard") to recover damages for defamation, false light, commercial disparagement and tortious interference with contract and to obtain an injunction against him with respect to future conduct and against Defendant IMS Technology Services, Inc. ("IMS") for damages because, as Mr. Leonard's employer, IMS is vicariously liable to the Plaintiff for Mr. Leonard's action.

### II.  Parties

1. The Plaintiff is a resident of New York State.

2. Mr. Leonard is a resident of the Commonwealth of Pennsylvania and at all times relevant to this Complaint was employed by IMS as its Director of Audio. Mr. Leonard resides at 63 Andrews Court, Aston, Pennsylvania 19014.

3. IMS is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 3055 McCann Farm Drive, Garnet Valley, Pennsylvania 19060.

### III.     Jurisdiction and Venue

4.      The Court has jurisdiction to hear this matter under 28 U.S.C. § 1332(a) because there is diversity of citizenship between the Plaintiff and the Defendants and because the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because IMS has its principal place of business in the District and Mr. Leonard resides there.

### IV.     Factual Background

6.      The Plaintiff is an audio engineer who specializes in sound system design. The Plaintiff has published over 50 technical articles, a full-length book, and co-authored a number of peer-reviewed papers on sound system design and related topics. The Plaintiff has presented his work for many professional industry bodies and events, including the National Association of Music Merchants, the Audio Engineering Society, the Event Safety Summit and the National Hearing Conservation Association Conference.

7.      The Plaintiff serves as the technical editor for ProSoundWeb.com, one of the most-visited professional audio engineering websites, and for the trade magazine *Live Sound International*, a widely read industry publication for live sound engineers.

8.      In October 2018, the Plaintiff created an audio engineering podcast called *Signal to Noise*, published via the ProSoundWeb platform. Within five years, the *Signal to Noise* podcast had grown to over 20,000 downloads per month and over half a million lifetime downloads, and had active Facebook page and Discord communities with thousands of members. The Discord community served as a community hub for audio engineers to network, build connections, and exchange knowledge.

9. Hannah Goodine became a member of the *Signal to Noise* community after meeting the Plaintiff at an Audio Engineering Society trade show in 2018. She is an active participant in the Discord group and started her own spinoff group to study audio engineering texts. According to Ms. Goodine, she "obviously benefitted from Michaels [sic] mentorship and guidance. I really appreciate everything he has contributed to the industry and how he has helped me personally."

10. Mr. Leonard has participated as a cohost on the *Signal to Noise* podcast since December 2019 at the Plaintiff's invitation.

11. From 2019 until Rational Acoustics LLC ("Rational Acoustics") severed its business relationship with the Plaintiff, the Plaintiff had been working as an independent contractor for Rational Acoustics, a developer of sound system analysis software as an instructor, application support specialist, educational content creator, and technical writer.

12. Ms. Goodine is employed by Rational Acoustics.

13. In May 2023, Rational Acoustics offered two professional audio training classes at its office in Woodstock, Connecticut, after which several Rational Acoustics staff members joined several of the participants enrolled at the class for a meal at a local restaurant called The Stomping Ground in Putnam, Connecticut. The Plaintiff was in the group, along with his then partner and now fiancé, who is also an experienced audio engineer.

14. During this meal on May 10, 2023, Ms. Goodine asked the Plaintiff via text message if he and his partner were in a relationship, and the Plaintiff replied in the affirmative. Upon learning this, Ms. Goodine became visibly agitated and told the Plaintiff that the age difference between him and his partner made their relationship inappropriate. At the time, the Plaintiff was 35 years old, and his partner was 29. The Plaintiff responded that his dating

3

decisions were between him and his partner and no business of Ms. Goodine's, and with that, the Plaintiff considered the matter closed.

15. Mr. Leonard and Ms. Goodine are friends, having met through their joint membership in the *Signal to Noise* community. Moreover, their employers, IMS and Rational Acoustics, do business with each other, and Mr. Leonard has visited Rational Acoustics' office for training sessions. Thus, Mr. Leonard's and Ms. Goodine's paths cross on many levels.

16. Shortly after this exchange between the Plaintiff and Ms. Goodine, Mr. Leonard attended InfoComm 2023, one of the largest industry trade events, hosted in Orlando, Florida on June 10–16, 2023. Mr. Leonard's attendance at this event was a function of his professional role as Director of Audio for IMS, which paid for his trade show badge admission, transportation, and lodging. The Plaintiff did not attend the trade show as he was traveling back from teaching a Rational Acoustics training class.

17. While at InfoComm, Mr. Leonard, while "on the clock" for IMS and in connection with his work duties, went to the Rational Acoustics booth. That itself is not surprising: he knows people who work for Rational Acoustics, and meeting up with friends and acquaintances and generally networking is one of the reasons why people go to tradeshows. Mr. Leonard, however, used his time at the Rational Acoustics booth to do far more than catch up with people he knew and make new contacts. Rather – at a booth located in the middle of the trade show floor at the one of the audio industry's largest annual events – Mr. Leonard asserted to Rational Acoustics employees in words or substance that the Plaintiff had a pattern of using his status in the *Signal to Noise* community and his prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. As Mr. Leonard told it, the Plaintiff offered these women his version of "pay to play": if you

have a sexual relationship with me, you'll benefit from my influence in the industry; if you don't, I'll use my influence against you.

18.     Mr. Leonard did not offer any substantiation or evidence for his outrageous claims, but these false statements regarding the Plaintiff became widely disseminated very quickly, raging through the very tight-knit audio community. The damage to the Plaintiff's reputation happened just as fast and was equally devastating. The detail below as to the booked and prospective gigs that the Plaintiff lost in the weeks after InfoComm ended leaves no doubt as to wide-spread damage that Mr. Leonard wrought.

19.     Shortly after he began his campaign against the Plaintiff at InfoComm, Mr. Leonard, along with Kyle Chirnside, another host who appeared on the *Signal to Noise* podcast at the Plaintiff's invitation, met with ProSoundWeb editor-in-chief Keith Clark. As noted above, ProSoundWeb sponsors ProSoundWeb.com, an influential audio engineering website, and the Plaintiff is the technical editor for it. During that meeting with Mr. Clark, Mr. Leonard repeated the same false allegations that he had made about the Plaintiff to employees of Rational Acoustics at InfoComm: that the Plaintiff had a "pattern" of inappropriate sexual relationships with young adult women in the *Signal to Noise* community, and that the Plaintiff should be "removed from the industry."

20.     After that meeting with Mr. Leonard, Mr. Clark asked the Plaintiff to step back from *Signal to Noise* while the allegations were investigated, and the Plaintiff willingly complied. Mr. Clark then asked Mr. Leonard multiple times to provide any evidence or substantiation to his claims, and Mr. Clark failed to do so. Following a two-month investigation, ProSoundWeb concluded that the allegations made by Mr. Leonard against the Plaintiff were not

only false, but maliciously fabricated, and in some cases directly contradicted by the evidence and testimony obtained by ProSoundWeb.

21. When Mr. Clark asked Mr. Leonard to justify his decision to make these damaging, unsubstantiated allegations about the Plaintiff to one of his clients in the midst of a professional industry event and in the office of another (that is, ProSoundWeb), Mr. Leonard claimed that he was "protecting ProSoundWeb." Not only did ProSoundWeb never seek out Mr. Leonard's assistance, it fired him for making false allegations against the Plaintiff.

22. During that same discussion, Mr. Leonard also told Mr. Clark that, when it came to the Plaintiff, Mr. Leonard felt that young adult women in the industry couldn't make their own dating decisions because these women found the Plaintiff so "mesmerizing" that they "couldn't help themselves," implying a lack of consent.

23. Mr. Leonard said what he said about the Plaintiff at InfoComm and to ProSoundWeb for only one reason: to destroy the Plaintiff's professional reputation. And Mr. Leonard did what he set out to do in spades. InfoComm 2023 ended on June 16, 2023. On June 23, 2023, the Plaintiff received an email from an audio engineer based in Germany stating that Rational Acoustics had informed a gathering of audio instructors that the Plaintiff would no longer be working with Rational Acoustics despite the Plaintiff having received no such notification from Rational Acoustics.

24. Four days later, the Plaintiff received a telephone call from a U.S-based audio instructor, Michael Curtis. During that conversation, Mr. Curtis relayed to the Plaintiff that Rational Acoustics told Mr. Curtis that it had ended its professional relationship with the Plaintiff. Mr. Curtis went on to tell the Plaintiff that Rational Acoustics had offered Mr. Curtis a

position similar to the one former held by the Plaintiff. For its part, Rational Acoustics has yet to inform the Plaintiff that it terminated its agreement with the Plaintiff, yet alone why it did so.

25. At the time Rational Acoustics ended its relationship with the Plaintiff – which the Plaintiff believes was a direct result of Mr. Leonard's campaign against him – Rational Acoustics was paying the Plaintiff $5,000 a month plus $900 per day for teaching and speaking engagements. Between January 1, 2023 and May 31, 2023, Rational Acoustics paid the Plaintiff slightly over $44,000 plus expenses.

26. In the same week that Mr. Curtis spoke to the Plaintiff, the Plaintiff also received an email from Rick Sands Entertainment Group ("RSE"), a client for whom the Plaintiff had worked over 40 shows, informing the Plaintiff that he had been replaced as the audio systems engineer for the upcoming 2023 Ghost tour. RSE did this even though the Plaintiff had done several months' worth of the pre-production work in anticipation of working for RSE on that tour.

27. Under the 2022 arrangement that the Plaintiff had with RSE, RSE paid the Plaintiff $3,410 per week while he was working for RSE, and the Plaintiff was actively negotiating a higher rate for the 2023 tour to reflect the increased market rates for audio engineering services. Within roughly a week of InfoComm 2023 ending, the Plaintiff's work with RSE – a long-standing client – evaporated, and the Plaintiff believes that that was directly attributable to Mr. Leonard's campaign to discredit the Plaintiff. When the Plaintiff asked RSE to at least pay him for the work he had already done to get ready for the tour, RSE simply ignored those requests. The Plaintiff would have earned at least $27,280 under the 2022 rates that the Plaintiff had in place with RSE, and that amount would have been significantly higher under the rate structure that the Plaintiff was negotiating with RSE when it disengaged from him.

28. Meyer Sound, a loudspeaker manufacturer, was the next client to drop the Plaintiff. On May 5, 2023, Meyer Sound and the Plaintiff entered into a contract under which the Plaintiff agreed to provide sound system engineering services for an event in Colorado. The Plaintiff's fee for that single engagement was to be $5,000 (a rate of $1,000 per day). In addition to this one engagement, Meyer Sound wanted the Plaintiff to provide further services for additional future events on a regular basis, and encouraged Plaintiff to consider contracted employee status. Thus, the Plaintiff stood to make at least $30,000 in the following six months. And because of Mr. Leonard's offensive against the Plaintiff's reputation, all of the Plaintiff's opportunities with Meyer Sound disappeared.

29. As noted above, prior to InfoComm 2023, the Plaintiff had agreements in place with ProSoundWeb, Rational Acoustics, RSE and Meyer Sound.. Ignoring any additional work from his existing clients, any work from new clients and no rate increase, the Plaintiff expected to make at least $87,280 for the period from June 1, 2023 and December 31, 2023, from these clients. Within several weeks of InfoComm 2023 ending, every one of the Plaintiff's standing clients except ProSoundWeb had ended its working relationship with him.

30. On August 12, 2023, the Plaintiff went to the Emergency Department at Rome Health Hospital in Rome New York, at the urging of his primary care physician, as the Plaintiff was exhibiting severe levels of stress, chest pressure, and elevated heart rate due to the ongoing stress and anxiety caused by the continuing fallout of reputational damage. The Plaintiff was treated for a highly elevated resting heart rate of 135 bpm in a reclined position, placed on an I.V. and a medication regimen to attempt to mitigate the effects of prolonged stress on his physical health.

31. On October 21, 2023, Adelman Law Group, PLLC sent a letter to Mr. Leonard on behalf of the Plaintiff, with the offer that if Mr. Leonard donated $10,000 to the industry advocacy group The Roadie Clinic within 10 days, the Plaintiff would forgo seeking a substantially larger amount in damages. Mr. Leonard ignored this correspondence.

32. On November 1 2023, the Plaintiff contacted the Human Resources department at IMS and spoke with the HR manager, Tracy O'Connor, informing her of Mr. Leonard's actions and that the Plaintiff intended to seek legal recourse against Mr. Leonard. The Plaintiff also expressed frustration that Mr. Leonard had not been held accountable for his actions, to which Ms. O'Connor replied, "A lawsuit should help with that!" The Plaintiff then asked Ms. O'Connor to confirm whether IMS had funded Mr. Leonard's travel to, and admission into, InfoComm 2023. Ms. O'Connor replied that she would investigate internally and be back in touch. Ms. O'Connor did not follow up with the Plaintiff, and Ms. O'Connor ignored the Plaintiff's subsequent calls.

33. On January 15, 2024, the Plaintiff sent demand letters to Mr. Leonard and to IMS, outlining the facts of Mr. Leonard's actions and statements defaming the Plaintiff while working for IMS, and once again making an offer that the Plaintiff would take no further action against either party if Mr. Leonard would retract, correct, and apologize for his false and defamatory statements. Mr. Leonard, again, ignored this correspondence.

34. IMS responded in a letter dated January 23 2024, in which it claimed that "any statements made by Mr. Leonard were in his personal capacity and unrelated to his employment with IMS," despite his statements being made at a professional event, during business hours, on the tradeshow floor, to the staff of a company with which Mr. Leonard and IMS have repeatedly engaged in business, and despite them having paid for Mr. Leonard to attend the industry event.

9

## COUNT I – DEFAMATION *PER SE*
## PLAINTIFF v. LEONARD and IMS

35. The Plaintiff realleges and reincorporates by reference each of the allegations in the prior paragraphs.

36. Mr. Leonard's statements to Rational Acoustics at the InfoComm 2023 trade show and to ProSoundWeb management, regarding the Plaintiff were defamatory *per se* in that Mr. Leonard falsely and recklessly stated or asserted that the Plaintiff was sexually grooming young women interested in careers as sound engineers by linking their advancement in an industry heavily dependent on personal referrals from individuals who were well-known in the industry to providing sexual favors to the Plaintiff.

37. Mr. Leonard uttered the defamatory statements.

38. Mr. Leonard's statements are defamatory per se because they imputed serious sexual misconduct to the Plaintiff.

39. Mr. Leonard's statements were clearly applicable to the Plaintiff, whom Mr. Leonard identified by name.

40. The recipients of Mr. Leonard's communication understood both its application to the Plaintiff and its defamatory meaning.

41. The Plaintiff has sustained special harm as a direct and proximate cause of the publication of the false and inflammatory statements made by Mr. Leonard, including but not limited to, loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large.

42. Moreover, as a direct and proximate result of Mr. Leonard's defamatory statements, the Plaintiff has suffered, and continues to suffer, from depression, insomnia and anxiety.

43. Mr. Leonard was not privileged to make these false and inflammatory statements concerning the Plaintiff.

44. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

COUNT II – DEFAMATION
<u>PLAINTIFF v. LEONARD and IMS</u>

45. The Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

46. Mr. Leonard's statements to Rational Acoustics at the InfoComm 2023 trade show and to ProSoundWeb management, regarding the Plaintiff were defamatory in that Mr. Leonard with actual malice falsely stated or asserted that the Plaintiff was sexually grooming young adult women interested in careers as sound engineers by offering to mentor them and then linking that mentoring and thus their advancement in an industry heavily dependent on personal referrals from individuals who were well-known in the industry to providing sexual favors to the Plaintiff.

47. Mr. Leonard's statements were defamatory in that they tended to harm the Plaintiff's reputation by lowering him in the estimation of the community and deter third persons from associating or dealing with him.

48. Mr. Leonard uttered the defamatory statements.

49. Mr. Leonard's statements were clearly applicable to the Plaintiff, whom Mr. Leonard identified by name.

50. The recipients of Mr. Leonard's communication understood both its application to the Plaintiff and its defamatory meaning.

51. The Plaintiff has sustained special harm as a direct and proximate cause of the publication of the false and inflammatory statements made by Mr. Leonard, including but not limited to, loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large.

52. Moreover, as a direct and proximate result of Mr. Leonard's defamatory statements, the Plaintiff has suffered, and continues to suffer, from depression, insomnia and anxiety.

53. Mr. Leonard was not privileged to make these false and inflammatory statements concerning Mr. Lombardo.

54. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

COUNT III – DEFAMATION BY IMPLICATION
PLAINTIFF v. LEONARD and IMS

55. The Plaintiff realleges and reincorporates by reference each of the prior paragraphs.

56. The statements that Mr. Leonard uttered to Rational Acoustics and to others concerning his allegations concerning the Plaintiff's relationship with young adult women were defamatory by innuendo in that those statements are reasonably suspectable to defamatory meaning, namely, that the Plaintiff predatorially takes advantage of his status as the mentor in his mentor/mentee relationship with young women.

57. Mr. Leonard's false and inflammatory statements regarding the Plaintiff's alleged sexual behavior have been applied to him, and any person hearing Mr. Leonard's false statements concerning the Plaintiff understood the defamatory meaning of the false and inflammatory statements concerning the Plaintiff's professional conduct.

58. The Plaintiff has sustained special harm as a direct and proximate cause of the publication of the false and inflammatory statements made by Mr. Leonard, including but not limited to, loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large.

59. Moreover, as a direct and proximate result of Mr. Leonard's defamatory statements, the Plaintiff has suffered, and continues to suffer, from depression, insomnia and anxiety.

60. Mr. Leonard was not privileged to make these false and inflammatory statements concerning the Plaintiff.

61. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

COUNT IV – FALSE LIGHT
PLAINTIFF v. LEONARD and IMS

62. The Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

63. Mr. Leonard falsely communicated and publicized to third parties that the Plaintiff was engaged in the sexual grooming of young adult women under the guise of providing mentorship in the sound engineering industry to them.

64. The light in which Mr. Leonard's statements cast the Plaintiff is highly offensive to a reasonable person.

65. Mr. Leonard knew of or acted in reckless disregard as to the falsity of the matters he publicized and the false light in which the Plaintiff would be placed.

66. As a result of Mr. Leonard's conduct, the Plaintiff was placed in a false light and thus Mr. Leonard is subject to the Plaintiff for the invasion of his privacy.

67. As a direct and proximate result of Mr. Leonard's statements, the Plaintiff has sustained loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large, and has suffered, and continues to suffer, from depression, insomnia, and anxiety.

68. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

## COUNT V – COMMERCIAL DISPARAGEMENT
## PLAINTIFF v. LEONARD and IMS

69. The Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

70. The Plaintiff runs his own company that provides live sound mixing, sound system design and tuning, education, training, and technical writing and editing services to production companies, publications, and manufacturers in the audio industry.

71. Mr. Leonard made disparaging statements concerning the Plaintiff's reputation that were false, and these false statements severely impacted the Plaintiff's business.

72. Mr. Leonard either made the disparaging statements in order to cause financial loss to the Plaintiff or reasonably should have recognized that the making of those disparaging statements would result in a financial loss for the Plaintiff, by directing his statements towards parties with whom the Plaintiff had an active professional relationship.

73. The Plaintiff, in fact, suffered financial loss.

74. Mr. Leonard either knew that the statements were false or acted in reckless disregard for their truth or falsity.

75. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

COUNT VI – TORTIOUS INTERFERENCE WITH
ACTUAL OR PROSPECTIVE CONTRACTUAL RELATIONS
PLAINTIFF v. LEONARD and IMS

76. The Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

77. Prior to the time the Plaintiff's claims against Mr. Leonard arose and as set forth in paragraphs ___ above, the Plaintiff had in place contracts with third parties to provide audio engineering services to those third parties.

78. Prior to the time the Plaintiff's claims against Mr. Leonard arose and as set forth in paragraphs ___ above, the Plaintiff was in contract negotiations with prospective third parties to provide audio engineering services to those third parties.

15

79. Mr. Leonard purposefully acted in ways specifically intended to cause harm to the Plaintiff's existing and/or prospective contractual relationships with these third parties and did so without privilege or justification.

80. As a direct result of Mr. Leonard's purposeful actions, these third parties terminated their relationships with the Plaintiff, and as a result of those terminations, the Plaintiff suffered significant financial injury.

81. To the extent Mr. Leonard is determined to be liable to the Plaintiff under this count, IMS is vicariously liable to the Plaintiff to the same extent as is Mr. Leonard because IMS was, at all relevant times here, Mr. Leonard's employer and because the Plaintiff's claim here arose while Mr. Leonard was acting within the scope of his employment.

### ARTICLE VII – REQUEST FOR A PERMANENT INJUNCTION
### PLAINTIFF v. LEONARD

82. As a result of Mr. Leonard's defamatory statements and actions, the Plaintiff has suffered irreparable harm both to his professional reputation and his ability to obtain work as a sound engineer. Moreover, the harm caused by Mr. Leonard is ongoing.

83. As a result of Mr. Leonard's defamatory statements and actions, the Plaintiff has suffered irreparable harm both to his professional reputation and his ability to obtain work as a sound engineer. Moreover, the harm caused by Mr. Leonard is ongoing.

84. The remedies available at law are inadequate to compensate the Plaintiff for the injuries that he has suffered as a result of Mr. Leonard defaming him and otherwise harming him.

85. A permanent injunction is warranted here upon consideration of the balance of hardships as between the Plaintiff and Mr. Leonard.

**WHEREFORE**, the Plaintiff respectfully requests that the Court grant the following relief:

As against Mr. Leonard and IMS:

(a) As to Count I (Defamation *Per Se*), presumed damages in an amount in excess of $75,000, together with punitive damages;

(b) As to Counts II through VI, actual damages in an amount in excess of $75,000, together with punitive damages; and

(c) The costs of this action, together with such other relief as the Court may deem just and proper here.

As against Mr. Leonard only:

(a) a permanent injunction as requested in Count VII enjoining Mr. Leonard from making any further defamatory statements against the Plaintiff; and

(b) The costs of this action, together with such other relief as the Court may deem just and proper here.

Dated: June 8, 2024                                            Respectfully submitted,

*/s/ Michael Lombardo*

Michael Lombardo, Pro Se
45 Laurel Trail
Monroe NY 10950
Telephone: (315) 225-5429
Email: iamthemichaellawrence@gmail.com