IN THE UNITED STATES DISTICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL LAWRENCE LOMBARDO, | CIVIL ACTION |
| Plaintiff, | No. 2-24-cv-01711-KBH |
| v. | |
| CHRISTOPHER BRYAN LEONARD and<br>IMS TECHNOLOGY SERVICES, INC., | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO MOTIONS OF
DEFENDANTS CHRISTOPHER BRYAN LEONARD AND IMS
TECHNOLOGY SERVICES, INC. TO DISMISS PLAINTIFF'S
<u>AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

  The Defendants here, Christopher Bryan Leonard ("Mr. Leonard") and IMS Technology Services, Inc. ("IMS," and with Mr. Leonard, the "Defendants") each have filed motions to dismiss my Amended Complaint and briefs in support. Because the Defendants' briefs make substantially the same arguments, I will file one brief addressing most of the arguments made by each Defendant. I will not, however, address the Defendants' arguments that I have not alleged the publicity element required for a false light claim, nor will I address Mr. Leonard's argument that I cannot seek an injunction under the facts of this case. Rather, I consent to dismissal of those counts of the Amended Complaint (Counts IV and VII) with prejudice.

<u>STATEMENT OF FACTS</u>

This is an action to recover damages from Mr. Leonard, a former friend and colleague, because of the false statements about me that harmed my reputation both professionally and personally and caused me direct financial harm. I also seek to recover damages against Mr. Leonard's employer, IMS, because Mr. Leonard committed his acts during the course of and within the

scope of the employment. I am a 36-year-old audio engineer who specializes in sound system design. Complaint ¶6. I have published over 50 technical articles and a full-length book and have co-authored a number of peer-reviewed papers on sound system design and related topics. Complaint ¶6. I have presented my work for many professional industry bodies and events, including the National Association of Music Merchants, the Audio Engineering Society, the Event Safety Summit and the National Hearing Conservation Association Conference. Complaint ¶6. I also serve as the technical editor for ProSoundWeb.com, one of the most-visited professional audio engineering websites. Complaint ¶¶6, 7. In October 2018, I created an audio engineering podcast called Signal to Noise, published via the ProSoundWeb platform. Within five years, the Signal to Noise podcast had grown to over 20,000 downloads per month and over half a million lifetime downloads and had active Facebook page and Discord communities with thousands of members. Complaint ¶8. In December 2019 and at my request, Mr. Leonard, one of the Defendants here, joined the Signal to Noise podcast as a co-host. Complaint ¶10.

The genesis of this action was a text exchange that Hannah Goodine and I had on May 10, 2023, when she and I were part of a group having dinner together. Ms. Goodine is an employee of Rational Acoustics LLC ("Rational Acoustics"), Complaint ¶12, and from 2019 until it severed its business relationship with me, I worked as an independent contractor for Rational Acoustics, a developer of sound system analysis software as an instructor, application support specialist, educational content creator, and technical writer. Complaint ¶11. On that evening in May 2023, when Ms. Goodine and I, along with others who had attended a training session at Rational Acoustics earlier that day were having dinner, Ms. Goodine asked me in text message if I and my fiancé, who was also at the dinner, were dating. Complaint ¶14. When I responded that we were, Ms. Goodine became visibly agitated and told me that the age

2

difference between my partner (who was 29 at the time) and myself (I was 35) made our relationship inappropriate. Complaint ¶14. I told Ms. Goodine that our relationship was none of her business, and I figured (incorrectly, it turns out) that the issue of whom I dated was closed. Complaint ¶14. It's important to note here that Mr. Leonard and Ms. Goodine are friends, having met through their joint membership in the Signal to Noise community. Moreover, their employers, IMS and Rational Acoustics, do business with each other, and Mr. Leonard has visited Rational Acoustics' office for training sessions. Thus, Mr. Leonard's and Ms. Goodine's paths cross on many levels. Complaint ¶15.

Shortly after I had this exchange with Ms. Goodine, Mr. Leonard attended InfoComm 2023, one of the largest industry trade events, hosted in Orlando, Florida on June 10–16, 2023. Complaint ¶16. Mr. Leonard's attendance at this event was a function of his professional role as the then Director of Audio for IMS, and IMS paid for his trade show badge admission, transportation, and lodging. Complaint ¶16. I did not attend the trade show because, ironically, I was traveling back from teaching a Rational Acoustics training class. Complaint ¶16. While at InfoComm, Mr. Leonard, during working hours when he was being paid by IMS to represent its interests, went to the Rational Acoustics booth. Complaint ¶17. While there, Mr. Leonard used his time at the booth to do far more than catch up with people he knew and make new contacts. Rather – at a booth located in the middle of the trade show floor at the one of the audio industry's largest annual events – Mr. Leonard asserted to Rational Acoustics employees that I had a pattern of using my status in the Signal to Noise community and what he viewed as my prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. Complaint ¶17. As Mr. Leonard told it, I offered these women my own version of "pay to play": if you have a sexual relationship with me,

3

you'll benefit from my influence in the industry; if you don't, I'll use my influence against you. Complaint ¶17. Mr. Leonard did not offer any substantiation or evidence for his outrageous claims, but his false statements about me became widely disseminated very quickly, raging through the very tight-knit audio community. Complaint ¶18.

Shortly after InfoComm ended, Mr. Leonard, along with Kyle Chirnside, another host whom I asked to join the Signal to Noise podcast, met with ProSoundWeb editor-in-chief Keith Clark. Complaint ¶19. (As noted earlier, Clark operates ProSoundWeb.com, an influential audio engineering website, of which I am the technical editor.) During that meeting with Mr. Clark, Mr. Leonard repeated the same false allegations that he had made about me to employees of Rational Acoustics at InfoComm: that I had a "pattern" of inappropriate sexual relationships with young adult women in the Signal to Noise community and that I should be "removed from the industry." Complaint ¶19.

After that meeting with Mr. Leonard, Mr. Clark asked me to step back from Signal to Noise while the allegations were investigated, and I willingly complied. Complaint ¶20. Mr. Clark then asked Mr. Leonard multiple times to provide any evidence or substantiation to his claims, and Mr. Leonard failed to do so. Complaint ¶20. Following a two-month investigation, ProSoundWeb concluded that the allegations made by Mr. Leonard against me were not only false, but maliciously fabricated, and in some cases directly contradicted by the evidence and testimony obtained by ProSoundWeb. Complaint ¶20. When Mr. Clark asked Mr. Leonard to explain why he thought it was acceptable to make such damaging, unsubstantiated allegations about me to Rational Acoustics' employees and to him, Mr. Leonard said only that that he was "protecting ProSoundWeb." Complaint ¶21. Mr. Leonard's statements are particularly ironic because not only did ProSoundWeb never seek out Mr. Leonard's assistance in any matter

relating to me, but it actually fired him for making the false allegations that he did about me and the subsequent lies he told ProSoundWeb executive staff to retroactively justify his behavior. Complaint ¶21.

Mr. Leonard made the defamatory statements that he did about me to Rational Acoustics' employees at InfoComm and to ProSoundWeb for only one reason: to destroy my professional reputation (after all, he requested of my employers that I be "removed from the industry"). Complaint ¶¶22, 23. And he certainly accomplished what he set out to do. On June 23, 2023 – one week after InfoComm ended – I received an email from an audio engineer based in Germany telling me that Rational Acoustics had informed a gathering of audio instructors that I would no longer be working with them. Complaint ¶23. Four days later, I received a telephone call from a U.S-based audio instructor, Michael Curtis, who told me during that conversation that Rational Acoustics had told him that it had ended its professional relationship with me. Complaint ¶24. Mr. Curtis went on to tell me that Rational Acoustics had offered him a position similar to the one that I had with it. Complaint ¶24. For its part, Rational Acoustics has yet to inform me that it terminated its agreement with me, yet alone why it did so, despite our contractual agreement specifying a requirement of 30 days notice. Complaint ¶24. At the time Rational Acoustics ended its relationship with me – a decision that was a direct result of Mr. Leonard's campaign against me – Rational Acoustics was paying me $5,000 a month plus $900 per day for teaching and speaking engagements. Between January 1, 2023 and May 31, 2023, Rational Acoustics paid me slightly more than $44,000 in fees. Complaint ¶25.

During the same week that my German colleague and Mr. Curtis spoke to me about these developments with Rational Acoustics, I also received an email from Rick Sands Entertainment Group ("Rick Sands"), a client for whom I had worked over 40 shows, telling me that I had been

replaced as the audio systems engineer for the upcoming Ghost tour. Complaint ¶27. At the time Rick Sands terminated our relationship, I had already done several months' worth of pre-production work related to that tour. Complaint ¶27. Under the 2022 arrangement that I had with Rick Sales, Rick Sales paid me $3,410 per week, and I was in the process of negotiating a higher rate for the tour to reflect the increased industry rates since the previous tour. Complaint ¶27. I would have earned at least $27,280 under the 2022 rates I had in place with Rick Sands, and that amount would have been significantly higher under my new rate structure. Complaint ¶27. But Rick Sands ended our relationship because it learned of the false statements that Mr. Leonard made about me at InfoComm. Complaint ¶27.

Meyer Sound, a loudspeaker manufacturer, was the next client to drop me. On May 5, 2023, Meyer Sound and I entered into a contract under which I agreed to perform audio engineering services for them. Complaint ¶27. My fee for that single engagement was $5,000. My previous arrangement with Meyer Sound provided for a rate of $1,000 per day. Complaint ¶27

Meyer Sound was also actively recruiting me to become a full-time employee. Complaint ¶27. And because of Mr. Leonard's campaign to discredit me professionally through false statement, all of the opportunities that I had with Meyer Sound vanished. Complaint ¶27.

In addition to the agreements that I had in place with ProSoundWeb, Rational Acoustics, Rick Sands and Meyer Sound. Ignoring any additional work from my existing clients, any work from new clients and no rate increase, I expected to make at least $87,280 just for the six-month period from June 1, 2023 to December 31, 2023, from these clients. Complaint ¶29. Within several weeks of InfoComm 2023 ending, every one of my standing clients except ProSoundWeb had ended its relationship with me. Complaint ¶29. After offering Mr. Leonard two opportunities in writing to retract the defamatory statements that he made about me and receiving no response

6

to either offer and after notifying IMS of Mr. Leonard's conduct only be told by it that Mr. Leonard's actions against me were unrelated to his employment with IMS despite it occurring during business hours at an industry event, Complaint ¶¶31, 33, I filed this action.

## STANDARD OF REVIEW

A complaint should only be dismissed under Fed. R. Civ. P. 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n. 14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). Pro se filings are to be construed liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013)).

## ARGUMENT

### PLAINTIFF HAS STATED A DEFAMATION CLAIM BASED ON MR. LEONARD'S ACTIONABLE STATEMENTS

The Defendants contend that the statements that Mr. Leonard made about me and my alleged mistreatment of young women in the audio industry represent statements of opinion and

7

are thus non-actionable. The Defendants are wrong: even if Mr. Leonard's statements could be characterized as opinions, those "opinions" are still capable of defamatory meaning.

The benchmark for determining whether a statement of opinion is capable of defamatory meaning is whether the opinion "may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. Ct. 1986) (quoting *Beckman v. Dunn*, 419 A.2d 583, 587 (Pa. Super. Ct. 1980)); *see generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (recognizing that "expressions of 'opinion' may often imply an assertion of objective fact"). The Third Circuit explained the distinction between an opinion which discloses its underlying facts and one that implies the existence of undisclosed facts:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-*holder* discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Redko Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985). Whether a statement qualifies as a true opinion or an "opinion" which implies the existence of undisclosed derogatory facts is a question of law to be resolved by the court. *See Green v. Mizner*, 692 A.2d 169, 174 (citing *Mathias v. Carpenter*, 587 A.2d 1, 2-3 (Pa. Super. Ct. 1991)).

When Mr. Leonard made the statement that he did about me, he clearly did not disclose the underlying facts that supposedly supported his "opinion" about me. If he had, he certainly would have made it part of the record here. Without disclosing the underlying facts, this "opinion" implies that Mr. Leonard's judgment is based, at least in part, on his personal knowledge. Cf. *Redco*, 758 F.2d at 972 (finding opinion disclosing underlying facts not

defamatory because "a listener may choose to accept or reject [the opinion] on the basis of an independent evaluation of the facts"); *Parano v. O'Connor*, 641 A.2d 607 (Pa. Super. Ct. 1994) (finding that defamatory comments that appellant was "adversarial, less than helpful, and uncooperative" incapable of defamatory meaning because they were subjective opinions based on disclosed facts); *Baker*, 532 A.2d at 402 (finding that a letter written by dean regarding an art professor's performance was not defamatory where it expressed conclusions based upon an investigation of the art department and actually disclosed the facts gleaned from the investigation underlying the complained-of statements).

      Moreover, the statements that Mr. Leonard made of me, when heard by the average listener, suggest the existence of some undisclosed defamatory facts. After all, Mr. Leonard made his comments about me to management-level employees of both Rational Acoustics and ProSoundWeb, and those employees presumably knew, as I alleged in the Amended Complaint, that Mr. Leonard and I worked closely together. ProSoundWeb knew this because Mr. Leonard and I were both co-hosts of the Signal to Noise Podcast which was a ProSoundWeb publication, and Rational Acoustics knew this because they were a sponsor of the podcast. *Amended Complaint ¶¶ 7, 10.* Thus, they would presume that Mr. Leonard would have personal knowledge of facts on which to base the things he said about me. *See Roffman v. Trump*, 754 F. Supp. 411, 419 (E.D. Pa. 1990) (denying summary judgment and finding that disparaging comments as to investment analyst's job performance were capable of defamatory meaning since "there can be little doubt that a person who hears someone criticizing another's job performance would presume that the person doling out the disparaging comments possessed knowledge of some facts on which to base the criticism"); *Ramsey v. AT&T Corp.*, No. 97-1301, 1997 WL 560183, at *6 (E.D. Pa. Aug. 27, 1997) (finding that statements made by human relations

9

director were capable of defamatory meaning since an average recipient could infer that the assessment of the plaintiff's work performance was based on undisclosed information). In short, the Defendants' argument that Mr. Leonard's statements were unactionable opinions is simply wrong.

    I must address two other arguments that the Defendants raise in connection with their erroneous claim that Mr. Leonard's statements about me were only expressions of subjective opinion. First, the Defendants play fast and loose in suggesting that I am a public figure and thus the rules applicable to such figures in defamation actions should apply to me. I made no such allegation in my Amended Complaint, and the Defendants have not even tried to explain why I should be considered one, yet alone what category of public figure they think I fall into. *See Gertz v. Robert Welch, Inc*., 418 U.S. 323, 345 (1974) (categorizing types of public figures into three classes: (i) individuals who maintain a position of "such persuasive power and influence that they are deemed public figures for all purposes"; (ii) individuals who become public figures without any "purposeful action"; and (iii) individuals who are deemed public figures only within the context of a particular dispute as a result of voluntarily "thrust[ing] themselves to the forefront of particular controversies in order to influence the resolution of the issues involved"). Furthermore, the question of whether a defamation plaintiff is a public figure is a question of law. *See, e.g.*, *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 498 (E.D. Pa. 2010). The Defendants' conclusory assertions that I am a public figure are insufficient to meet their burden of demonstrating their entitlement to dismissal as a matter of law on that basis. The allegations in the Amended Complaint certainly do not compel the conclusion that I am a public figure, much less with respect to the alleged defamatory statements at issue. As for Mr. Leonard's reference to *Olszewski v. Sinclar Broad. Grp., Inc.*, 2003 WL 22512091 (Pa. Ct. Comm. Pl. 2003), that is not

even persuasive. First, the decision was on a motion for summary judgment, not a motion to dismiss. And although the court made passing reference to the fact that "both parties [were] public figures," it was the *defendant* who was the radio talk show host. His status as public figure thus did not factor into any analysis of the defamation claim. Since I am not a public figure, the "provably false" analysis does not apply, and Mr. Leonard has made no argument for dismissal based on the normal standard that the statements he made about me are "substantially true."

Nor, for that matter, do the allegations of the Amended Complaint relate to a matter of public concern. A public controversy must be a "real dispute, the outcome of which affects the *general public* or some segment of it," and the dispute must "affect more than its immediate participants." *Amor v. Conover*, 635 F. Supp. 3d 363, 368 (E.D. Pa. 2022). This case is not like those cases discussed in *Amor*, on which Mr. Leonard relies — those cases involve allegations of sexual misconduct in public schools and against minors, not allegations regarding consensual behavior between purely private people.

Second, the Defendants repeatedly tell the Court that I failed to identify the individuals to whom Mr. Leonard made the defamatory statements. The federal pleading standards, however, impose no such a requirement. As I noted in my discussion regarding the standard of review applicable the Defendants' pending motions, *Twombly* and *Iqbal* do not require a plaintiff to make "detailed factual allegations," *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008). Rather, a plaintiff must only "set out 'sufficient factual matter' to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S., at 677). In the Amended Complaint, I allege that Mr. Leonard made defamatory statements about me at the Rational Acoustics booth at InfoComm 2023, and I have identified where he made those statements. Further details as to whom the statements were made are not

11

necessary under the federal rules. *See, e.g., Am. Standard Life and Accident. Ins. Co.*, 701 F. Supp. 527, 540 (M.D. Pa. 1988) (rejecting defendants' motion to dismiss defamation claim for failure to identify the person to whom the alleged statements were made and holding that under federal pleading standards an allegation that "statements were allegedly made to policyholders of plaintiff" was sufficient); *see also Jones v. Johnson & Johnson*, Doc. No. 94-7473, 1995 U.S. Dist. LEXIS 13453, at *2-3 (E.D. Pa. Sept. 13, 1995) ("Pennsylvania law requires pleading with heightened specificity in defamation cases," but under the federal rules, more stringent pleading is not required).[1]

---

[1] Although the Defendants do not acknowledge it, I did identify by name the person at ProSoundWeb that Mr. Leonard made his statement about me to.

## THE DEFENDANTS' OUTDATED SUGGESTIONS NOTWITHSTANDING, THE PLAINTIFF HAS, IN FACT, STATED A CLAIM FOR DEFAMATION *PER SE*

The Defendants' arguments for why my defamation *per se* claim should be dismissed are nothing short of incredible. As the Defendants see it, the conduct that Mr. Leonard accused me of – presenting young women in my industry with the option of sleeping with me and gaining my professional support or not and risking me blackballing them in the industry – do not rise to the level of "serious sexual misconduct." In support of this troubling assertion, the Defendants direct the Court to a decision from this district that quotes a nearly 50-year-old commentary as to what constitutes "serious sexual misconduct" for purposes of defamation *per se*. In most circles, however, the understanding of what "serious sexual misconduct" is has evolved from "imput[ations] of unchastity to a woman, whether married or married . . . and to statements charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general charges of unchaste conduct," Restatement (Second) of Torts § 574, Comment b, to mean exactly what I allege Mr. Leonard told management-level employees of Rational Acoustics and the editor and publisher of ProSoundWeb. The law, after all, must be stable, but there's no requirement that it be stagnant. Moreover, the *Goldfarb* court wasn't even considering whether the kind of conduct that I complain of here supports a defamation per se claim, but whether the defendant's assertion that the plaintiff in that case "condoned" and "protected" other who engaged in serious sexual misconduct gives rise to such a claim. *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 462, n.12 ("It is less clear whether Defendant's assertions that Plaintiff condoned serious sexual misconduct is defamation *per se*."). The issue that the *Goldfarb* court considered may be in the gray area, but the statements that Mr. Leonard made about me are not. Those statements allege serious sexual misconduct on my part and thus support a defamation *per se* claim.

13

## JUST AS THE DEFENDANTS' ATTACKS ON THE PLAINTIFF'S DEFAMATION CLAIM FAIL, SO DO THEIR CHALLENGES TO THE DEFAMATION BY IMPLICATION CLAIM

The Defendants attack my defamation by implication count using the very same argument that they use to attack my defamation count: Mr. Leonard's statements about me were merely his opinions and opinions cannot support a defamation claim. And for the very same reasons that that argument fails with respect to my defamation count, it fares no better here. The Defendants' challenge to my defamation by implication claim must be denied.

## THE PLAINTIFF, A BUSINESS OWNER, HAS STATED A CLAIM FOR COMMERCIAL DISPARAGEMENT AGAINST THE DEFENDANTS

In arguing that my claim for commercial disparagement must be dismissed, the Defendants again come up short. A commercial disparaging statement is one that is intended "to cast doubt upon the existence or extent of another's property, chattels or intangible things, *or upon their quality*." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir. 1990) (emphasis added). As I stated in the Amended Complaint, I derive most of my annual income from providing audio engineering services at live music events in venues throughout the country. Because of the conduct that the #MeToo movement brought into the daylight, the entire entertainment industry – including the audio engineering industry – is keenly sensitive to issues involving the sexual harassment and sexual abuse of women in the workplace. In this environment of heighted attention to this kind of conduct, Mr. Leonard's attacks on me unquestionably bring into question my suitability as an engineer. In instances like mine where one can't separate the services provided by a business from the business owner, an attack on me is also an attack on the service that I provide. Because, then, Mr. Leonard's attacks on me amount to an attack on the quality or suitability of the services I provide, I have stated a claim for commercial disparagement. *See Weiser Law Firm, P.C. v. Hartlied*, 2022 WL 970757, at 1*16-

14

17 (E.D. Pa. Mar. 31, 2022) ("Because the two remaining statements [made by the defendant] arguably attack the quality of Plaintiffs' legal services, they are actionable for commercial disparagement.").

AT THIS STAGE IN THE LITIGATION, THE
PLAINTIFF IS ENTITLED TO EVERY INFERENCE IN
<u>SUPPORT OF HIS TORTIOUS INTERFERENCE CLAIMS</u>

The Defendants' request that the Court dismiss my claim for tortious interference because I did not specifically allege that Mr. Leonard knew of these contracts is premature. Because I am a *pro se* plaintiff, the Court must construe the allegations in the Amended Complaint liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)) ("We construe Vogt's pro se filings liberally"). With that guidance in mind, the Amended Complaint alleges that Mr. Leonard and I at one time had a close enough relationship that I invited him to join me as a co-host on my *Noise to Sound* podcast. Amended Complaint ¶10. Mr. Leonard also knew that I had professional relationships with Rational Acoustics, Inc. and with ProSoundWeb. Amended Complaint ¶¶13 and 17. His statements to others about me and how I allegedly manipulate young women in the audio engineering industry, Amended Complaint ¶¶17 and 19, certainly suggest that he and I were close enough that I disclosed intimate details of my personal life with him. Taking all of these allegations in a light most favorable to me as the plaintiff and because a *pro se* litigant's filings are to be construed liberally, the Court can, at this point in the case, reasonably infer that Mr. Leonard, in fact, knew about my actual and prospective business relationships and that he intended to interfere with those relationships. *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)) (At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the pro se] complaint as true,' 'draw[ ]

all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, ... contains facts sufficient to state a plausible [ ] claim.'"). Because, I have asserted a facially plausible claim for tortious interference, the Defendants' request to dismiss that count must be denied. *Arch Ins. Co. v. Kriger Constr., Inc*., No. CV 22-4444, 2024 WL 1693989, at *1 (E.D. Pa. Mar. 26, 2024) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

## IT WOULD BE PREMATURE TO DISMISS THE PLAINTIFF'S VICARIOUS LIABILITY CLAIM

IMS seeks dismissal of my respondeat superior claims on the grounds that Mr. Leonard's statements were "not made during the course of [Mr.] Leonard's employment nor were they made in the furtherance of IMS's business." IMF Brief, Doc. No. 17-1, p 16. The first assertion is false and the second cannot be substantiated at this stage of the litigation.

Under the theory of respondeat superior, "an employer is liable for [the] torts of its employees 'which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment.'" *Kilbride Invs. Ltd. v. Cushman & Wakefield of Pa., Inc.*, 294 F. Supp. 3d 369, 377 (E.D. Pa. 2018) (quoting *Costa v. Rox Borough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998)). "This applies to intentional conduct as well as negligent conduct." *Id.* (quoting *Shaup v. Jack D's, Inc.*, No. 03-cv-5570, 2004 U.S. Dist. LEXIS 16191, 2004 WL 1837030, at *2 (E.D. Pa. Aug. 17, 2004)). "The conduct of an employee is considered 'within the scope of employment' for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; [and] (3) it is actuated, at least in part, by a purpose to serve the employer." *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437, 461-62 (M.D. Pa.

2007) (quoting *R.A. ex rel. N.A. v. First Church of Christ*, 2000 PA Super 58, 748 A.2d 692, 699 (Pa. Super. Ct. 2000)). "If the facts fail to support a reasonable inference that the employee was acting in furtherance of his employer's business, the servant's conduct falls outside the scope of his employment as a matter of law." *Shaup*, 2004 U.S. Dist. LEXIS 16191, 2004 WL 1837030, at *2 (citing *Lezotte v. Allegheny Health Educ. & Research Found.*, No. 97-cv-4959, 1998 U.S. Dist. LEXIS 6119, 1998 WL 218086, at *13-15 (E.D. Pa. May 1, 1998)).

In the Amended Complaint, I allege that Mr. Leonard made the statements that he did about me during an event where "attendance . . . was a function of his professional role as Director of Audio for IMS, which paid for his trade badge, admission, transportation and lodging." Amended Complaint ¶16. I further allege that Mr. Leonard, while "on the clock" and "at a booth located in the middle of the trade show floor, Amended Complaint ¶17, made his defamatory statements about me.[2] Thus, the Amended Complaint satisfies the first and second prongs of the "within the scope of employment" test. As for the third prong – that the activity is actuated, at least in part, by a purpose to serve the employer – the Amended Complaint alleges enough *at this stage of the litigation* "to support a reasonable inference that the employee was acting in furtherance of" IMS's business. *Shaup*, 2004 WL 1837030, at *2. For instance, I point out in the Amended Complaint that IMS and Rational Acoustics LLC ("Rational") do business together, that Mr. Leonard visited Rational's office for training sessions and that at least one Rational employee – a woman – and Mr. Leonard are friends. Amended Complaint ¶15. I further allege that Mr. Leonard made the defamatory statements about me that he did because Mr.

---

[2] IMS tells the Court that Mr. Leonard's "comments were not made during a sanctioned portion of the trade show itself; rather, as Plaintiff noted in his Amended Complaint, they were made while 'meeting up with friends and acquaintances . . . .'" IMF Brief, Doc. 17-1, p. 17. That statement is untrue. As I stated above, what I actually alleged is that Mr. Leonard "was on the clock" and "at a booth in the middle of the trade show floor" when he made his defamatory statements about me.

17

Leonard "felt that young adult women in the industry couldn't make their own dating decisions because these women found [me] so 'mesmerizing' that they couldn't help themselves." Amended Complaint ¶22. In short, I allege that Mr. Leonard justified his actions by telling at lease ProSoundWeb that he was protecting the industry – an industry that includes both IMS and its business partner Rational – from me. Protecting IMS and Rational would seem to further IMS's business interests. At least at this stage of the litigation here, I have stated a claim against IMS, and its request that my vicarious liability claims be dismissed must be denied.

## CONCLUSION

For the reasons set forth above, I request that the Court deny the Defendants' motions to dismiss in all respects. Alternatively, if the Courts decides to dismiss any claim (other than those two which I have agreed to dismiss), I ask that I be granted leave to further amend the Amended Complaint to cure any deficiencies identified by the Court. Rule 15(a) provides that, other than in certain circumstances where a party may amend a pleading as a matter of course, a party may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The Rule further explains that a court should "freely give leave [to amend the pleadings] when justice so requires." *Id*. In line with the requirements of the Rule, the Third Circuit has adopted a liberal approach in allowing amendments under Rule 15 so as to ensure that "claim[s] will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir.1990); *see also Aerocrine AB v. Apieron Inc.*, Civ. No. 08–787–LPS, 2010 WL 1225090, at *7 (D. Del. Mar. 30, 2010). In line with these considerations, the "factors [that a court should] consider in weighing a motion for leave to amend are well-settled: (1) whether the amendment has been unduly delayed; (2) whether the amendment would unfairly prejudice the non-moving party; (3) whether the amendment is brought for some improper

purpose; and (4) whether the amendment is futile." *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, Civ. No. 11–54–SLR, 2012 WL 2365905, at *2 (D. Del. June 21, 2012) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Aerocrine AB*, 2010 WL 1225090, at *7. The non-movant bears the burden to demonstrate that the proposed amendment should be denied. *See, e.g., Price v. Trans Union, LLC*, 737 F.Supp.2d 276, 279 (E.D. Pa. 2010). *MacQueen*, No. CV 13-831-SLR-CJB, 2014 WL 1338729, at *2 (D. Del. Apr. 1, 2014).

Dated: July 22, 2024                                    Respectfully submitted,

*Michael Lombardo*
Michael Lombardo, Pro Se
45 Laurel Trail
Monroe NY 10950
Telephone: (315) 225-5429
Email: iamthemichaellawrence@gmail.com