## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL LAWRENCE LOMBARDO,** **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **CHRISTOPHER BRYAN LEONARD and IMS TECHNOLOGY SERVICES, INC., Defendants.** | **NO. 2:24-cv-01711-KBH** |

### MEMORANDUM

**HODGE, J.**                                                                                    **March 25, 2025**

Plaintiff Michael Lombardo initiated this action in response to statements made by Defendant Christopher Bryan Leonard that Plaintiff argues harmed his reputation, both professionally and personally, and caused Plaintiff financial harm. In addition to Leonard, Plaintiff also seeks to recover damages against IMS Technology Services, Inc. ("IMS"), Leonard's employer.

Plaintiff alleges claims of defamation *per se* (Count I), defamation (Count II), defamation by implication (Count III), false light (Count IV), commercial disparagement (Count V), and tortious interference with actual or prospective contractual relations (Count VI). Plaintiff claims IMS, as Leonard's employer, is vicariously liable for Leonard's actions. Plaintiff also requests a permanent injunction to prevent Leonard from making any further allegedly defamatory statements against Plaintiff.

Before the Court are Defendants' Motions to Dismiss Plaintiff's Amended Complaint (ECF No. 14-1 & ECF No. 17-1.) Leonard seeks to dismiss the claims by arguing that his statements were non-defamatory statements of opinion, and that Plaintiff fails to plead the

necessary facts to support the elements of each claim. (ECF No. 14-1 at 1-2.) IMS argues that the Amended Complaint fails to plead facts sufficient to establish vicarious liability and that Plaintiff has not sufficiently pled any underlying tort for which he asserts vicarious liability against IMS. (ECF No 17-1 at 2.)

Plaintiff consents to dismissal of the claim for false light (Count IV) and request for a permanent injunction (Count VII). Those Counts, IV and VII, are therefore dismissed. For the following reasons, Defendant IMS's Motion to Dismiss is granted. Defendant Leonard's Motion to Dismiss is granted in part and denied in part.

## I.    FACTUAL BACKGROUND[1]

Plaintiff is an audio engineer and serves as the technical editor for ProSoundWeb.com, an audio engineering website, and *Live Sound International* magazine, a publication for live sound engineers. (ECF No. 12 ¶ 6-7.) Plaintiff has published over fifty technical articles, a book, and co-authored several peer-reviewed papers on sound system design and related topics and has presented his work at professional conferences. (ECF No. 12 ¶ 6.) Plaintiff created a podcast called *Signal to Noise*[2], published via the ProSoundWeb platform. (ECF No. 12 ¶ 8.) Plaintiff has held contracts as an independent contractor for a variety of companies, including for Rational Acoustics LLC ("Rational Acoustics"), a developer of sound system analysis software. (ECF No. 12 ¶ 11.) Plaintiff worked for Rational Acoustics beginning in 2019 as an instructor, application support specialist, educational content creator, and technical writer. (ECF No. 12 ¶ 11.) Rational Acoustics is also a sponsor of the *Signal to Noise* podcast. (ECF No. 20 at 9.)

---

[1]    The Court adopts the pagination supplied by the CM/ECF docketing system.
[2]    It is unclear from Plaintiff's Complaint and Response to the Motion to Dismiss whether Plaintiff continues to act as a host or co-host for this podcast or has any role with the podcast currently.

IMS is a corporation organized under the laws of the Commonwealth of Pennsylvania. (ECF No. 12 ¶ 3.) According to its website, IMS is an "an award-winning provider of systems integration and event staging solutions." *See* https://imsts.com/. IMS and Rational Acoustics do business with each other. (ECF No. 12 ¶ 15.)

Leonard is employed by IMS as the Director of Audio. (ECF No. 12 ¶ 2.) Leonard has participated as a cohost of *Signal to Noise*, the podcast Plaintiff created, since December 2019 at Plaintiff's invitation. (ECF No. 12 ¶ 10.) In June 2023, Leonard attended InfoComm 2023, which is one of the largest audio industry trade events, in Orlando, Florida. (ECF No. 12 ¶ 16.) IMS paid for Leonard's admission, transportation, and lodging to attend the event. (EFC No. 12 ¶ 16.) Plaintiff did not attend the event. (ECF No. 12 ¶ 16.)

While at the industry trade event, Leonard was "on the clock" for IMS. (ECF No. 12 ¶ 17.) At some point during the event, Leonard went to the Rational Acoustics booth. (ECF No. 12 ¶ 17.) While there, Plaintiff claims that,

> Mr. Leonard asserted to Rational Acoustics employees in words or substance that the Plaintiff had a pattern of using his status in the Signal to Noise community and his prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. As Mr. Leonard told it, the Plaintiff offered these women his version of "pay to play": if you have a sexual relationship with me, you'll benefit from my influence in the industry; if you don't, I'll use my influence against you.

(ECF No. 12 ¶ 17.) Plaintiff states in his Complaint that when Leonard made these statements he did not offer evidence to support the statements. (ECF No. 12 ¶ 18.)

Plaintiff alleges that Leonard's statements were widely disseminated throughout the audio community. (ECF No. 12 ¶ 18.) Shortly after InfoComm, Leonard met with the editor-in-chief of ProSoundWeb, Keith Clark, and another host of the *Signal to Noise* podcast, Kyle Chirnside. (ECF No. 12 ¶ 19.) During this meeting, Leonard allegedly stated that " the Plaintiff had a 'pattern' of

inappropriate sexual relationships with young adult women in the Signal to Noise community, and that Plaintiff should be 'removed from the industry.'" (ECF No. 12 ¶ 19.)

After this meeting, Clark asked Plaintiff to step back from the podcast while the allegations were investigated. (ECF No. 12 ¶ 20.) The investigation lasted two months, after which ProSoundWeb concluded that the allegations Leonard made against Plaintiff were false. (ECF No. 12 ¶ 20.) Clark asked Leonard why he made the allegations and Leonard stated that he was "protecting ProSoundWeb," and that he "felt that young adult women in the industry couldn't make their own dating decisions because these women found the Plaintiff so 'mesmerizing' that they 'couldn't help themselves.'" (ECF No. 12 ¶ 21-22.) ProSoundWeb fired Leonard for making these allegations. (ECF No. 12 ¶ 21.)

Plaintiff claims the following repercussions occurred as a result of Leonard's statements:

- A week after InfoComm, Plaintiff received an email from an audio engineer based in Germany stating that Rational Acoustics had informed a gathering of audio instructors that Plaintiff would no longer be working with Rational Acoustics, despite Plaintiff having received no such notification from Rational Acoustics. (ECF No. 12 ¶ 23.);

- Eleven days after InfoComm, Plaintiff received a call from a U.S.-based audio instructor, Michael Curtis, who told Plaintiff that Rational Acoustics had informed him that they had ended their professional relationship with Plaintiff and that Rational Acoustics offered Curtis a position similar to the one formerly held[3] by Plaintiff. (ECF No. 12 ¶ 24.);

- About a week after InfoComm, Plaintiff received an email from Rick Sands Entertainment Group ("RSE"), a client for whom Plaintiff had worked over 40 shows, informing Plaintiff

---

[3]    It is unclear if Plaintiff was ever formerly terminated. Plaintiff alleges that Rational Acoustics "ended its relationship with the Plaintiff." (ECF No. 12 ¶ 25.) However, the Complaint also states that "Rational Acoustics has yet to inform the Plaintiff that it terminated its agreement with the Plaintiff, let alone why it did so." (ECF No. 12 ¶ 24.) It appears Plaintiff has lost his professional relationship with Rational Acoustics, whether formally or informally.

that he had been replaced as the audio systems engineer for the upcoming 2023 Ghost Tour, despite having completed several months of pre-production work. (ECF No. 12 ¶ 26.);

- Meyer Sound, a loudspeaker manufacturer, ended its relationship with Plaintiff. (ECF No. 12 ¶ 28.); and

- Within several weeks of InfoComm, every one of Plaintiff's standing clients except ProSoundWeb ended its working relationship with him. (ECF No. 12 ¶ 29.)

Plaintiff expected to make at least $87,280 from these professional relationships between June 1, 2023, and December 31, 2023. (ECF No. 12 ¶ 29.)

In addition to the impacts on his professional life, on August 12, 2023, Plaintiff went to the Emergency Department to receive treatment for severe stress and was prescribed medication to mitigate the effects of prolonged stress on his physical health. (ECF No. 12 ¶ 30.)

On November 1, 2023, Plaintiff contacted the Human Resources department of IMS. (ECF No. 12 ¶ 32.) Plaintiff spoke to an HR Manager, Tracey O'Connor, whom he informed about Leonard's actions and his intent to seek legal recourse. (ECF No. 12 ¶ 32.) Plaintiff asked O'Connor to confirm if IMS had funded Leonard's travel to and admission to InfoComm. (ECF No. 12 ¶ 32.) O'Connor stated she would investigate internally and contact Plaintiff; however, O'Connor did not contact Plaintiff or answer his subsequent calls. (ECF No. 12 ¶ 32.)

On January 15, 2024, Plaintiff sent demand letters to Leonard and IMS, outlining his allegations and offering to take no further action if Leonard would retract, correct, and apologize for the statements. (ECF No. 12 ¶ 33.) Leonard did not reply. (ECF No. 12 ¶ 33.) IMS responded to the letter stating that "any statements made by Mr. Leonard were in his personal capacity and unrelated to his employment with IMS." (ECF No. 12 ¶ 34.)

## II.    LEGAL STANDARD

In order to survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citation omitted). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Applying the principles of *Iqbal* and *Twombly*, the Third Circuit articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010). This "inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011)).

The pleading standard does not require a plaintiff to establish the elements of a *prima facie* case, but they must "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (internal citations omitted). However, "conclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Id.* at 210. "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id.*

### III.    DISCUSSION

#### A.  Vicarious Liability Claim Against IMS

The Court will first address the question of whether IMS is in any way responsible for Leonard's statements. Plaintiff asserts that IMS, as Leonard's then-employer, is vicariously liable for Leonard's actions. For an employer to be liable for the conduct of its employee, the employee's conduct must fall within the scope of his employment. *See Shaup v. Jack D's, Inc.*, No. CIV.A. 03-5570, 2004 WL 1837030, at *2 (E.D. Pa. Aug. 17, 2004) (citing *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1276 (3d Cir. 1979). Conduct is "'within the scope of employment' for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; [and] (3) it is actuated, at least in part, by a purpose to serve the employer." *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa. Super. Ct. 2000).

IMS argues that Plaintiff failed to establish that IMS is vicariously liable for Leonard's conduct because the statements were not made during the course of Leonard's employment, nor were they made in furtherance of IMS. (ECF No. 17-1 at 16.) IMS furthers this argument by stating that "IMS neither condoned nor directed Mr. Leonard to speak out in the way he did," and that "[t]he mere fact that IMS may have paid for Leonard's badge, transportation, and lodging [for the conference] or that he was 'on the clock' does not in and of itself lend credence to Plaintiff's claim that Leonard was therefore acting in the scope of his employment and in furtherance of a specific IMS objective." (ECF No. 17-1 at 16.)

Plaintiff argues that he satisfied the first two prongs of the within the scope of employment test. (ECF No. 20 at 17.) According to Plaintiff, Leonard was in fact acting within the scope of his employment because Leonard, (1) made the statements at InfoComm which is an event where

attendance was a function of Leonard's professional role as Director of Audio for IMS and (2) IMS paid for Leonard's admission and accommodations for the event. (ECF No. 20 at 17.)

Plaintiff also argues that he satisfies the final prong of the test, that Leonard acted, at least in part, to serve IMS. (ECF No. 20 at 17.) Plaintiff alleges that Leonard told ProSoundWeb Editor-in-Chief Clark that he made these statements because he was "protecting ProSoundWeb." (ECF No. 12 ¶ 21.) It remains unclear to the Court how an effort to protect ProSoundWeb—a company completely unrelated to IMS—could lead to an inference that Leonard was acting in furtherance of his employer, IMS.

While Leonard was at InfoComm on behalf of IMS, and IMS paid for him to attend the conference, this is simply not enough for the Court to endorse the notion that IMS is responsible for everything Leonard chose to say while at the conference—particularly statements completely divorced from Leonard's work at IMS. Plaintiff has failed to allege facts sufficient to convince the Court that Leonard's statements were within the scope of his employment. Thus, Plaintiff's vicarious liability claim fails.

For these reasons, Defendant IMS's Motion to Dismiss is granted. The Court will analyze the remainder of the claims as to Defendant Leonard only.

### B. Defamation (Count II)

In order to successfully establish a claim for defamation under Pennsylvania law, a plaintiff has the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a

conditionally privileged occasion. 42 Pa. C. S. § 8343; *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 476-77 (E.D. Pa. 2010) (citing 42 Pa. C. S. § 8343(a)).

Leonard challenges only elements one and six. Thus, the questions before the Court are: (1) did Leonard's communications have a defamatory character (element 1); and (2) did special harm result to the plaintiff from the publications (element 6).

### i) The communications are capable of a defamatory meaning.

To determine if the communications have a defamatory character, the Court must make a threshold determination of whether a challenged statement is capable of a defamatory meaning. *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 456 (E.D. Pa. 2021) (citing *Richette v. Phila. Magazine*, No. 802, 1996 WL 756953, at *2 (Pa. Ct. Com. Pl. Jan. 23, 1996) ("[A] trial court must first determine whether the offending statement, taken in context, would be interpreted by a reasonable reader as defamatory.")). The Pennsylvania courts have adopted the Restatement's definition of defamatory communication: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *See Altoona Clay Prods., Inc. v. Dun & Bradstreet, Inc.*, 367 F.2d 625, 628 (3d Cir. 1966) (quoting Restatement, Torts 559).

Leonard argues that his statements are non-actionable opinions because they are his subjective beliefs that are not provable. (ECF No. 14-1 at 8.) Plaintiff responds that the statements cannot be categorized as opinions, and even if the statements could be categorized as opinions, those opinions are still capable of defamatory meaning. (ECF No. 20 at 8.)

The Court disagrees with Leonard's categorization of the statements as a non-actionable opinion. No reasonable person would understand statements of this nature to be opinion. *Braig v. Field Communications*, 456 A.2d 1366, 1372 (Pa. Super. Ct. 1983). ("Whether a particular

statement constitutes fact or opinion is a question of law."). The Court finds that the alleged statements clearly fit within the definition of defamatory communication. There are two instances of defamatory statements alleged here:

(1) At the industry trade event Mr. Leonard asserted "in words or substance" to Rational Acoustics employees that "Plaintiff had a pattern of using his status in the *Signal to Noise* community and his prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. As Mr. Leonard told it, the Plaintiff offered these women his version of 'pay to play': if you have a sexual relationship with me, you'll benefit from my influence in the industry; if you don't, I'll use my influence against you;" and

(2) during a meeting with Kyle Chirnside and Keith Clark, Mr. Leonard alleged that "Plaintiff had a 'pattern' of inappropriate sexual relationships with young adult women in the *Signal to Noise* community."

(ECF No. 12 ¶ 17 & 19.) These statements are harmful to Plaintiff's reputation. Moreover, the average person to whom the statements were directed--others in the industry--would (and *did*) interpret these statements negatively. *See Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010). The statements are more than merely embarrassing or annoying, but rather, expose Plaintiff to public hatred, contempt, or ridicule. *Id.* ("When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory. . . . [H]e must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society."). The statements fall under "defamatory communication" as defined by Pennsylvania law; thus, the Court finds that the statements may be reasonably capable of a defamatory meaning.

### ii) Plaintiff has adequately plead that he experienced special harm as a result of the publication of the statements.

The second disputed element is whether Plaintiff met his burden to demonstrate special harm resulting to himself due to the statements. Under Pennsylvania law, to prevail on a

defamation case, a plaintiff must demonstrate "actual harm." *Weiser L. Firm, P.C. v. Hartleib*, 665 F. Supp. 3d 647, 669 (E.D. Pa. 2023). Actual harm includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 (2015).

Leonard argues that Plaintiff's failure to identify to whom the statements were made at InfoComm prevents Plaintiff from being able to draw a causal connection between the statements and the resulting damage. (ECF No. 14-1 at 7-8 (citing *Turk v. Salisbury Behav. Health, Inc*., No. 09-CV- 6181, 2010 WL 1718268, at *4 (E.D. Pa. Apr. 27, 2010) (holding statements were not defamatory which did not "state the circumstances under which they were allegedly made").) This comparison offered by Leonard and his reliance on *Turk* fails. The Complaint in this case includes much more factual detail than the complaint filed in *Turk*. In *Turk*, the complaint "does not identify the substance of the alleged defamatory statements, or state the circumstances under which they were allegedly made. Rather, plaintiff merely avers in conclusory fashion that defendants 'besmirched and defamed' him, and 'disseminated false statements . . . concerning [his] job performance.'" *Id.* at *4.

Here, Plaintiff alleges significantly more facts and details regarding the circumstances under which the defamatory statements were made. Plaintiff includes details about the statements, by whom the statements were made, the specific date that the statements were made, and the circumstances during which the statements were made. Plaintiff alleges that the short time frame between the defamatory statements made by Leonard at InfoComm and the subsequent loss of contracts evinces the causal relationship between the statements and the reputational harm suffered by Plaintiff. (ECF No. 12 ¶ 18.) The Court believes that these allegations raise a reasonable expectation that discovery more likely than not will reveal further evidence that the statements

were a causal factor in the impairment of Plaintiff's reputation and standing in the community, as well as his personal humiliation, mental anguish, and suffering. Thus, the Court does not find that the failure to identify by name the individuals at the trade show that Leonard made the statements to defeats Plaintiff's ability to draw a connection between the statements and the resulting damage.

Turning to the statements made to ProSoundWeb editor-in-chief Clark, Leonard claims that Plaintiff is unable to demonstrate damages resulting from his statements to Clark because "[Plaintiff] explicitly alleges that '[w]ithin several weeks of InfoComm 2023 ending, every one of Plaintiff's standing clients except ProSoundWeb had ended its working relationship with him.'" (ECF No. 14-1 at 9 (citing ECF No. 12 ¶ 29).)

However, Plaintiff states that the statements were made to Clark "shortly after" InfoComm. (ECF No. 12 at ¶ 19.) After the statements were made by Leonard to Clark, Clark asked Plaintiff to step away from his role with the podcast *Signal to Noise* while these allegations were investigated. (ECF No. 12 ¶ 20.) The investigation lasted two months. (ECF No. 12 ¶ 20.) During this time, Plaintiff was hospitalized and treated for stress and anxiety. (ECF No. 12 ¶ 30.) These facts, taken as true at this stage in the litigation, satisfy the pleading standard for actual harm under a defamation claim.

**iii) Plaintiff does not have a higher burden of proof at this stage of litigation.**

Leonard also asserts that Plaintiff is a public figure, and the statements are a matter of public concern. (ECF No. 14-1 at 5-6.) The bar is higher for allegedly defamatory statements against a public figure; Plaintiff must demonstrate that the comments are provably false and that the Defendant defamed him with actual malice. *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*, 923 A.2d 389, 400 (Super. Ct. Pa. 2007); *Ralston v. Garabedian*, 676 F. Supp. 3d

325, 349 (E.D. Pa. 2021). Leonard argues that the statements are opinions that cannot contain provably false connotations. (ECF No. 14-1 at 5-6.)

Defendant's argument that Plaintiff is a public figure is a difficult and fact-specific question that is rarely appropriate to address at the Motion to Dismiss stage. *See Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 562-63 (E.D. Pa. 2000); *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435 (E.D. Pa. 2021); *Gillon v. Bernstein*, No. 12-04891, 2013 WL 5159625, at *5 (D.N.J. Sept. 12, 2013) ("While the Complaint notes that Gillon has appeared on at least two television programs, ... the [c]ourt finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery."); *Trivedi v. Slawecki*, No. 4:11-02390, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (finding that the question of public figure status "is more appropriately resolved at the summary judgment stage on the basis of record evidence."). It would be premature for the Court to determine Plaintiff's status as a public figure without a more complete record. Thus, the Court will reserve the question of whether Plaintiff is a public figure for a later point in the litigation.

The Court finds that, at this stage, Plaintiff has alleged facts that satisfy the elements of defamation. The defamation claim will survive the Motion to Dismiss.

### C.  Defamation *per se* (Count I)

Defamation *per se* occurs when a statement is so inherently damaging that the law presumes the statement to be harmful. Thus, there is no requirement for a plaintiff to prove damages beyond reputational harm or personal humiliation. *See Nothstein v. USA Cycling*, 499 F. Supp. 3d 101, 122 (E.D. Pa. 2020) (quoting *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 344 (Pa. Super. 2008)). "Defamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Synygy, Inc. v.*

*Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 579 (E.D. Pa. 1999), aff'd sub nom. *Synygy, Inc. v. Scott-Levin*, 229 F.3d 1139 (3d Cir. 2000).

In determining if a statement amounts to serious sexual misconduct, this district follows the guidance of the Restatement of Torts. *See Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 775 (E.D. Pa. 2016); *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 461, n.12 (E.D. Pa. 2021). The Restatement (Second) of Torts has been generally applied to any statement that imputes any form of unchastity to a woman, married or single, irrespective of whether the conduct charged constitutes a criminal offense. . . . It does not apply to mere imputations of immodesty that do not imply unchaste conduct. Restatement (Second) of Torts § 574 (1977). The Restatement has been interpreted to apply to anyone who is accused of such conduct, not only women. *E.g. Baufield v. Safelite Glass Corp.*, 831 F. Supp. 713, 717 (D. Minn. 1993); *see also Rejent v. Liberation Publ'ns, Inc.*, 197 A.D.2d 240, 245 (N.Y. App. Div. 1994) (criticizing the selective application of the rule to women and adopting the Restatement's rule).

Leonard disputes that the conduct he accused Lombardo of was so egregious as to be considered "serious sexual misconduct." (ECF No. 14-1 at 9.) The Court does not find it necessary or useful to delve into this gray area. Leonard stated that Lombardo:

> [H]ad a pattern of using his status in the *Signal to Noise* community and his prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. . . . [and] Plaintiff offered these women his version of "pay to play": if you have a sexual relationship with me, you'll benefit from my influence in the industry; if you don't, I'll use my influence against you.

(ECF No. 12 ¶ 17.) This is serious sexual misconduct. *See Fogel v. Univ. of the Arts*, No. CV 18-5137, 2019 WL 1384577, at *11 (E.D. Pa. Mar. 27, 2019) (finding that statements that defendant "reported the forced non-consensual kiss to a group of women at the FotoFest 2016 conference in

Houston, Texas, several weeks after the alleged kiss happened" and that the Plaintiff "sexually assaulted and harassed [the Defendant]" could impute serious sexual misconduct to amount to defamation *per se*); *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 775 (E.D. Pa. 2016) (finding that statements that portrayed Plaintiff as a woman who exchanged sex for money and opportunity may rise to the level of "serious sexual misconduct" under Pennsylvania law).

Accepting all of Plaintiff's factual allegations as true, the Court concludes that there is a facially plausible claim for relief under Count I.

### D. Defamation by Implication (Count III)

Under Pennsylvania law, a defamation claim may exist under a theory of defamation by implication "where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 242 (E.D. Pa. 2012) (citing *Mzamane v. Winfrey*, 693 F.Supp.2d 442, 477 (E.D. Pa. 2010)). In defamation-by-implication cases, the alleged defamatory statement has two possible meanings, one that is defamatory and one that is not." *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (citing 50 Am.Jur.2d Libel and Slander § 158).

Leonard argues that because the allegedly defamatory statements in this case are purely opinion, they cannot be considered defamatory by implication. (ECF No. 14-1 at 10.) The Court agrees that the alleged statements do not fit the under a claim of defamation by implication, but for a different reason. Plaintiff does not argue that the statements were true and have a defamatory *implication*. Rather, Plaintiff repeatedly asserts the exact opposite: that the statements are false, Leonardo knew they were false when he made them, and that the listeners of the statements understood the defamatory meaning. (ECF No. 12 ¶ 21; ECF No. 12 ¶ 57). This is the exact

distinction between defamation and defamation-by-implication claims recognized by the Third Circuit. *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (citing 50 Am.Jur.2d Libel and Slander § 158 (explaining that "'[d]efamation by implication' occurs when a defendant juxtaposes a series of facts to imply a defamatory connection between them")). Applying Third Circuit guidance, this Court finds that the statements have a defamatory meaning rather than a defamatory implication, and thus fall outside the scope of a defamation-by-implication claim. Defendant Leonard's Motion to Dismiss the claim of defamation by implication is granted due to the legal deficiency of the claim.

Plaintiff's request for leave to amend the claim for defamation by implication is denied due to futility of amendment. The alleged statements only have one meaning, and thus properly fall under a defamation claim not defamation by implication. Therefore, the inclusion of additional factual allegations would not change the analysis of legal sufficiency of this claim. *See Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000) ("We fail to see, however, how the inclusion of these additional allegations would change the analysis underpinning the District Court's dismissal."). Therefore, Plaintiff's request for leave to amend Count III is denied.

### E. Commercial Disparagement (Count V)

To constitute a commercially disparaging statement, the statement must be "intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, if the matter is so understood by its recipient." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir. 1990) (citing *Menefee v. Columbia Broadcasting Sys., Inc.*, 329 A.2d 216, 219 (Pa. 1974)). Pennsylvania law creates a distinction between actions for defamation and actions for commercial disparagement that "turns on the harm towards which each

is directed." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir. 1990) (finding no action for commercial disparagement because the statements were directed at the *vendor*, rather than his goods). "An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements *attacking the quality of his goods* have reduced their marketability, while defamation is meant protect an entity's interest in character and reputation." *The Knit With v. Knitting Fever, Inc.*, No. CIV.A. 08-4221, 2010 WL 3792200, at *8 (E.D. Pa. Sept. 28, 2010) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir.1988)) (emphasis added).

Leonard argues his statements concerned Plaintiff's reputation, which is the distinguishing factor between defamation and commercial disparagement. (ECF No. 14-1 at 12.) Plaintiff argues that "Mr. Leonard's attacks on [Plaintiff] unquestionably bring into question [Plaintiff's] suitability as an engineer" because "one can't separate the services provided by a business from the business owner, an attack on [Plaintiff] is an attack on the services [he] provides." (ECF No. 20 at 14.)

To support this assertion, Plaintiff analogizes to *Weiser L. Firm, P.C. v. Hartleib*. 2022 WL 970757, at *16-17 (E.D. Pa. Mar. 31, 2022). (ECF No. 20 at 14-15.) In *Weiser L. Firm, P.C. v. Hartleib*, the statements made "arguably call[ed] into question the marketability of Plaintiff's legal services" because they directly related to the quality of the legal services provided by the Plaintiff. *Id.* at *17. This analogy offered by Plaintiff falls short because, here, the statements are directed at Plaintiff's sexual relationships with women in the audio industry. This alleged conduct does not have any bearing on the quality of the services the Plaintiff provides as an audio engineer. Thus, the claim is legally deficient to support a claim of commercial disparagement.

The Court agrees with Leonard that the alleged statements were directed at the Plaintiff and his reputation, not any good or service that he provides. *Compare Weiser L. Firm, P.C. v. Hartleib*, No. 2:19-CV-02728-KSM, 2022 WL 970757, at *17 (E.D. Pa. Mar. 31, 2022), *aff'd*, No. 23-1889, 2024 WL 5219737 (3d Cir. Dec. 26, 2024) ("Because the . . . statements arguably attack the quality of Plaintiffs' legal services, they are actionable for commercial disparagement."). This is the exact distinction etched by Pennsylvania law; thus, the claim properly falls under defamation not commercial disparagement.

Plaintiff's request for leave to amend the claim for commercial disparagement is denied due to futility of amendment as it is legally deficient. Therefore, Plaintiff's leave to amend is denied as to Count V.

### F. Tortious Interference with Actual or Prospective Contractual Relations (Count VI)

"Under Pennsylvania law, [tortious interference with contractual relations] has four elements: (1) the existence of a contractual relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm the contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) damages to the plaintiff as a result of the defendant's conduct." *Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207 (3d Cir. 2017) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 433 (3d Cir. 2013)).

Leonard argues that Plaintiff fails to allege that Leonard had knowledge of existing or prospective contracts and thus fails to allege that Leonard could have the specific intent to harm these contractual relationships. (ECF No. 14-1 at 14.) In his response, Plaintiff outlines three facts that he believes lead to the reasonable inference that Leonard knew of Plaintiff's "business relationships" and that he intended to interfere with those relationships. (ECF No. 20 at 15.) First,

Plaintiff states that he and Leonard at one time had a close enough relationship that Plaintiff invited Leonard to join as a co-host on the *Signal to Noise* podcast. (ECF No. 20 at 15 (citing ECF No. 12 ¶ 10).) Second, that Leonard knew that Plaintiff had professional relationships with Rational Acoustics and with ProSoundWeb. (ECF No. 20 at 15 (citing ECF No. 12 ¶ 13 & 17).) Third, the statements made by Leonard about Plaintiff's relationships with women in the audio industry suggest that Leonard and Plaintiff "were close enough that [Plaintiff] disclosed intimate details of [his] personal life with [Leonard]." (ECF No. 20 at 15 (citing ECF No. 12 ¶ 17 &19).) Plaintiff argues that "the Court can, at this point in the case, reasonably infer that Mr. Leonard, in fact, knew about my actual and prospective business relationships." (ECF No. 20 at 15.)

However, Plaintiff fails to support a rational inference that Leonard acted with *intent* to harm him by interfering with his contractual relations. First, "[f]or a defendant to have specific intent to harm a contractual relationship, it must first have knowledge of that contractual relationship." *Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207, 211 (3d Cir. 2017). "[T]hat knowledge must be specific to the particular contractual right upon which the defendant infringes. *General knowledge of a business relationship is not sufficient.*" *Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207, 211 (3d Cir. 2017) (citation omitted) (emphasis added).

Plaintiff has not alleged that Leonard had actual knowledge of Plaintiff's contracts. While Leonard does not need to know the specific details of the contractual relationships, Leonard's general knowledge of Plaintiff's business relationships is insufficient to satisfy the actual knowledge requirement under a claim for tortious interference. *See Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207, 211 (3d Cir. 2017) (finding that the "circumstantial evidence is insufficient to raise a genuine dispute of material fact as to knowledge, even drawing all reasonable inferences in Appellant's favor"). The facts that Plaintiff offers to lead to the inference that Leonard knew of

Plaintiff's contractual relationships fall short. That the two men once had a close relationship, or that Leonard had knowledge of some of Lombardo's businesses partnerships is not enough to support an allegation that Leonard had knowledge of the actual contracts. Because Plaintiff has not even shown that Leonard knew of the contracts, Plaintiff cannot allege that Leonard intentionally interfered with them.

Leonard's Motion to Dismiss for tortious interference with actual or prospective contractual relations is granted. Should Plaintiff believe he can supply the Court with additional factual support for his claim, he may amend his Complaint with respect to Count VI.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Leonard's Motion to Dismiss is granted in part and denied in part. Defendant IMS's Motion to Dismiss is granted. An appropriate order follows.


**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**