IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

MICHAEL LAWRENCE LOMBARDO,

Plaintiff,

v.                                                   Case No. 2:24-cv-01711-KBH

CHRISTOPHER BRYAN LEONARD,

Defendant.

_____

## SECOND AMENDED COMPLAINT

### I.    Introduction

Plaintiff Michael Lawrence Lombardo ("Plaintiff") brings this action against Defendant Christopher Bryan Leonard ("Defendant") to recover damages for defamation, false light, commercial disparagement and tortious interference with contract and to obtain an injunction against him with respect to future conduct.

### II.    Parties

1.    Plaintiff is a resident of New York State.

2.    Defendant Leonard is a resident of the Commonwealth of Pennsylvania and at all times relevant to this Complaint was employed by IMS Technology Services, Inc. ("IMS") as its Director of Audio. Defendant resides at 63 Andrews Court, Aston, Pennsylvania 19014.

### III.    Jurisdiction and Venue

3.    The Court has jurisdiction to hear this matter under 28 U.S.C. §

1332(a) because there is diversity of citizenship between Plaintiff and the Defendant and because the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides there.

IV.    Factual Background

5.    Plaintiff is an audio engineer who specializes in sound system design. Plaintiff has published over 50 technical articles, a full-length book, and co-authored a number of peer-reviewed papers on sound system design and related topics. Plaintiff has presented his work for many professional industry bodies and events, including the National Association of Music Merchants, the Audio Engineering Society, the Event Safety Summit and the National Hearing Conservation Association Conference.

6.    Plaintiff serves as the technical editor for ProSoundWeb.com, one of the most-visited professional audio engineering websites, and for the trade magazine *Live Sound International*, a widely read industry publication for live sound engineers.

7.    In October 2018, Plaintiff created an audio engineering podcast called *Signal to Noise*, published via the ProSoundWeb platform. Within five years, the *Signal to Noise* podcast had grown to over 20,000 downloads per month and over half a million lifetime downloads, and had active Facebook page and Discord

communities with thousands of members. The Discord community served as a community hub for audio engineers to network, build connections, and exchange knowledge.

8.      Hannah Goodine ("Goodine") became a member of the *Signal to Noise* community after meeting Plaintiff at an Audio Engineering Society trade show in 2018. She is an active participant in the Discord group and started her own spinoff group to study audio engineering texts. According to Goodine, she "obviously benefitted from Michaels [sic] mentorship and guidance. I really appreciate everything he has contributed to the industry and how he has helped me personally."

9.      Defendant has participated as a cohost on the *Signal to Noise* podcast since December 2019 at the Plaintiff's invitation.

10.     From 2019 until Rational Acoustics LLC ("Rational Acoustics") severed its business relationship with the Plaintiff, Plaintiff had been working as an independent contractor for Rational Acoustics, a developer of sound system analysis software as an instructor, application support specialist, educational content creator, and technical writer.

11.     Goodine is and was employed by Rational Acoustics.

12.     In May 2023, Rational Acoustics offered two professional audio training classes at its office in Woodstock, Connecticut, after which several Rational Acoustics staff members joined several of the participants enrolled at the

class for a meal at a local restaurant called The Stomping Ground in Putnam, Connecticut. Plaintiff was in the group, along with his then partner and now fiancé, who is also an experienced audio engineer.

13.    During this meal on May 10, 2023, Goodine asked Plaintiff via text message if he and his partner were in a relationship, and Plaintiff replied in the affirmative. Upon learning this, Goodine became visibly agitated and told Plaintiff that the age difference between him and his partner made their relationship inappropriate. At the time, Plaintiff was 35 years old, and his partner was 29. Plaintiff responded that his dating decisions were between him and his partner and no business of Goodine's, and with that, Plaintiff considered the matter closed.

14.    Defendant and Goodine are friends, having met through their joint membership in the *Signal to Noise* community. Moreover, their employers, IMS and Rational Acoustics, do business with each other, and Defendant has visited Rational Acoustics' office for training sessions. Thus, Defendant's and Goodine's paths cross on many levels.

15.    Shortly after this exchange between Plaintiff and Goodine, Defendant attended InfoComm 2023, one of the largest industry trade events, hosted in Orlando, Florida on June 10–16, 2023. Defendant's attendance at this event was a function of his professional role as Director of Audio for IMS, which paid for his trade show badge admission, transportation, and lodging. Plaintiff did not attend the trade show as he was traveling back from teaching a Rational Acoustics

training class.

16.    While at InfoComm, Defendant, while "on the clock" for IMS and in connection with his work duties, went to the Rational Acoustics booth. That itself is not surprising: he knows people who work for Rational Acoustics, and meeting up with friends and acquaintances and generally networking is one of the reasons why people go to tradeshows. Defendant, however, used his time at the Rational Acoustics booth to do far more than catch up with people he knew and make new contacts. Rather – at a booth located in the middle of the trade show floor at the one of the audio industry's largest annual events – Defendant asserted to Rational Acoustics employees in words or substance that Plaintiff had a pattern of using his status in the *Signal to Noise* community and his prominence in the audio industry generally to sexually exploit young adult women who are trying to enter the audio industry or advance in it. As Defendant told it, Plaintiff offered these women his version of "pay to play": if you have a sexual relationship with me, you'll benefit from my influence in the industry; if you don't, I'll use my influence against you.

17.    Defendant did not offer any substantiation or evidence for his outrageous claims, but these false statements regarding Plaintiff became widely disseminated very quickly, raging through the very tight-knit audio community. The damage to the Plaintiff's reputation happened just as fast and was equally devastating. The detail below as to the booked and prospective gigs that Plaintiff lost in the weeks after InfoComm ended leaves no doubt as to wide-spread damage

that Defendant wrought.

18.    Shortly after he began his campaign against Plaintiff at InfoComm, Defendant, along with Kyle Chirnside, another host who appeared on the *Signal to Noise* podcast at the Plaintiff's invitation, met with ProSoundWeb editor-in-chief Keith Clark. As noted above, ProSoundWeb sponsors ProSoundWeb.com, an influential audio engineering website, and Plaintiff is the technical editor for it. During that meeting with Mr. Clark, Defendant repeated the same false allegations that he had made about Plaintiff to employees of Rational Acoustics at InfoComm: that Plaintiff had a "pattern" of inappropriate sexual relationships with young adult women in the *Signal to Noise* community, and that Plaintiff should be "removed from the industry."

19.    After that meeting with Defendant, Mr. Clark asked Plaintiff to step back from *Signal to Noise* while the allegations were investigated, and Plaintiff willingly complied. Mr. Clark then asked Defendant multiple times to provide any evidence or substantiation to his claims, and Mr. Clark failed to do so. Following a two-month investigation, ProSoundWeb concluded that the allegations made by Defendant against Plaintiff were not only false, but maliciously fabricated, and in some cases directly contradicted by the evidence and testimony obtained by ProSoundWeb.

20.    When Mr. Clark asked Defendant to justify his decision to make these damaging, unsubstantiated allegations about Plaintiff to one of his clients in the

midst of a professional industry event and in the office of another (that is, ProSoundWeb), Defendant claimed that he was "protecting ProSoundWeb." Not only did ProSoundWeb never seek out Defendant's assistance, but it also fired him for making false allegations against the Plaintiff.

21.    During that same discussion, Defendant also told Mr. Clark that, when it came to the Plaintiff, Defendant felt that young adult women in the industry couldn't make their own dating decisions because these women found Plaintiff so "mesmerizing" that they "couldn't help themselves," implying a lack of consent.

22.    Defendant said what he said about Plaintiff at InfoComm and to ProSoundWeb for only one reason: to destroy the Plaintiff's professional reputation. And Defendant did what he set out to do in spades. InfoComm 2023 ended on June 16, 2023. On June 23, 2023, Plaintiff received an email from an audio engineer based in Germany stating that Rational Acoustics had informed a gathering of audio instructors that Plaintiff would no longer be working with Rational Acoustics despite Plaintiff having received no such notification from Rational Acoustics.

23.    Four days later, Plaintiff received a telephone call from a U.S-based audio instructor, Michael Curtis. During that conversation, Mr. Curtis relayed to Plaintiff that Rational Acoustics told Mr. Curtis that it had ended its professional relationship with the Plaintiff. Mr. Curtis went on to tell Plaintiff that Rational Acoustics had offered Mr. Curtis a position similar to the one former held by the

Plaintiff. For its part, Rational Acoustics has yet to inform Plaintiff that it terminated its agreement with the Plaintiff, yet alone why it did so.

24.    At the time Rational Acoustics ended its relationship with Plaintiff–which Plaintiff believes was a direct result of Defendant's campaign against him – Rational Acoustics was paying Plaintiff $5,000 a month plus $900 per day for teaching and speaking engagements. Between January 1, 2023 and May 31, 2023, Rational Acoustics paid Plaintiffs lightly over $44,000 plus expenses.

25.    In the same week that Mr. Curtis spoke to the Plaintiff, Plaintiff also received an email from Rick Sands Entertainment Group ("RSE"), a client for whom Plaintiff had worked over 40 shows, informing Plaintiff that he had been replaced as the audio systems engineer for the upcoming 2023 Ghost tour. RSE did this even though Plaintiff had done several months' worth of the pre-production work in anticipation of working for RSE on that tour.

26.    Under the 2022 arrangement that Plaintiff had with RSE, RSE paid Plaintiff $3,410 per week while he was working for RSE, and Plaintiff was actively negotiating a higher rate for the 2023 tour to reflect the increased market rates for audio engineering services. Within roughly a week of InfoComm 2023 ending, the Plaintiff's work with RSE – a long-standing client – evaporated, and Plaintiff believes that that was directly attributable to Defendant's campaign to discredit the Plaintiff. When Plaintiff asked RSE to at least pay him for the work he had already done to get ready for the tour, RSE simply ignored those requests. Plaintiff would

have earned at least $27,280 under the 2022 rates that Plaintiff had in place with RSE, and that amount would have been significantly higher under the rate structure that Plaintiff was negotiating with RSE when it disengaged from him.

27.    Meyer Sound, a loudspeaker manufacturer, was the next client to drop Plaintiff. On May 5, 2023, Meyer Sound and Plaintiff entered into a contract under which Plaintiff agreed to provide sound system engineering services for an event in Colorado. Plaintiff's fee for that single engagement was to be $5,000 (a rate of $1,000 per day). In addition to this one engagement, Meyer Sound wanted Plaintiff to provide further services for additional future events on a regular basis and encouraged Plaintiff to consider contracted employee status. Thus, Plaintiff stood to make at least $30,000 in the following six months. And because of Defendant's offensive against the Plaintiff's reputation, all of the Plaintiff's opportunities with Meyer Sound disappeared.

28.    As noted above, prior to InfoComm 2023, Plaintiff had agreements in place with ProSoundWeb, Rational Acoustics, RSE and Meyer Sound. Ignoring any additional work from his existing clients, any work from new clients and no rate increase, Plaintiff expected to make at least $87,280 for the period from June 1, 2023 and December 31, 2023, from these clients. Within several weeks of InfoComm 2023 ending, every one of the Plaintiff's standing clients except ProSoundWeb had ended its working relationship with him.

29.    On August 12, 2023, Plaintiff went to the Emergency Department at

Rome Health Hospital in Rome New York, at the urging of his primary care physician, as Plaintiff was exhibiting severe levels of stress, chest pressure, and elevated heart rate due to the ongoing stress and anxiety caused by the continuing fallout of reputational damage. Plaintiff was treated for a highly elevated resting heart rate of 135 bpm in a reclined position, placed on an I.V. and a medication regimen to attempt to mitigate the effects of prolonged stress on his physical health.

30.    On October 21, 2023, Adelman Law Group, PLLC sent a letter to Defendant on behalf of Plaintiff, with the offer that if Defendant donated $10,000 to the industry advocacy group The Roadie Clinic within 10 days, Plaintiff would forgo seeking a substantially larger amount in damages. Defendant ignored this correspondence.

31.    On November 1 2023, Plaintiff contacted the Human Resources department at IMS and spoke with the HR manager, Tracy O'Connor, informing her of Defendant's actions and that Plaintiff intended to seek legal recourse against Defendant. Plaintiff also expressed frustration that Defendant had not been held accountable for his actions, to which Ms. O'Connor replied, "A lawsuit should help with that!" Plaintiff then asked Ms. O'Connor to confirm whether IMS had funded Defendant's travel to, and admission into, InfoComm 2023. Ms. O Connor replied that she would investigate internally and be back in touch. Ms. O'Connor did not follow up with the Plaintiff, and Ms. O'Connor ignored Plaintiff's subsequent calls.

32. On January 15, 2024, Plaintiff sent demand letters to Defendant and to IMS, outlining the facts of Defendant's actions and statements defaming Plaintiff while working for IMS, and once again making an offer that Plaintiff would take no further action against either party if Defendant would retract, correct, and apologize for his false and defamatory statements. Defendant, again, ignored this correspondence.

33. IMS responded in a letter dated January 23 2024, in which it claimed that "any statements made by Defendant were in his personal capacity and unrelated to his employment with IMS," despite his statements being made at a professional event, during business hours, on the tradeshow floor, to the staff of a company with which Defendant and IMS have repeatedly engaged in business, and despite them having paid for Defendant to attend the industry event.

## COUNT I – DEFAMATION *PER SE*

34. Plaintiff realleges and reincorporates by reference each of the allegations in the prior paragraphs.

35. Defendant's statements to Rational Acoustics at the InfoComm 2023 trade show and to ProSoundWeb management, regarding Plaintiff were defamatory *per se* in that Defendant falsely and recklessly stated or asserted that Plaintiff was sexually grooming young women interested in careers as sound engineers by linking their advancement in an industry heavily dependent on personal referrals from individuals who were well-known in the industry to providing sexual favors

to the Plaintiff.

36.    Defendant uttered the defamatory statements.

37.    Defendant's statements are defamatory *per se* because they imputed serious sexual misconduct to the Plaintiff.

38.    Defendant's statements were clearly applicable to the Plaintiff, whom Defendant identified by name.

39.    The recipients of Defendant's communication understood both its application to Plaintiff and its defamatory meaning.

40.    Plaintiff has sustained special harm as a direct and proximate cause of the publication of the false and inflammatory statements made by Defendant, including but not limited to, loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large.

41.    Moreover, as a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered, and continues to suffer, from depression, insomnia and anxiety.

42.    Defendant was not privileged to make these false and inflammatory statements concerning the Plaintiff.

## COUNT II – DEFAMATION

43.    Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

44.    Defendant's statements to Rational Acoustics at the InfoComm 2023

trade show and to ProSoundWeb management, regarding Plaintiff were defamatory in that Defendant with actual malice falsely stated or asserted that Plaintiff was sexually grooming young adult women interested in careers as sound engineers by offering to mentor them and then linking that mentoring and thus their advancement in an industry heavily dependent on personal referrals from individuals who were well-known in the industry to providing sexual favors to the Plaintiff.

45.    Defendant's statements were defamatory in that they tended to harm the Plaintiff's reputation by lowering him in the estimation of the community and deter third persons from associating or dealing with him.

46.    Defendant uttered the defamatory statements.

47.    Defendant's statements were clearly applicable to the Plaintiff, whom Defendant identified by name.

48.    The recipients of Defendant's communication understood both its application to Plaintiff and its defamatory meaning.

49.    Plaintiff has sustained special harm as a direct and proximate cause of the publication of the false and inflammatory statements made by Defendant, including but not limited to, loss of income, irreparable reputation harm, and loss of standing both in the professional community and in the community at large.

50.    Moreover, as a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered, and continues to suffer, from depression,

insomnia and anxiety.

51.    Defendant was not privileged to make these false and inflammatory statements concerning Mr. Lombardo.

## COUNT III – TORTIOUS INTERFERENCE WITH ACTUAL OR PROSPECTIVE CONTRACTUAL RELATIONS

52.    Plaintiff realleges and reincorporates by reference each of the allegations of the prior paragraphs.

53.    Prior to the time the Plaintiff's claims against Defendant arose and as set forth above, Plaintiff had in place contracts with third parties to provide audio engineering services to those third parties.

54.    Prior to the time the Plaintiff's claims against Defendant arose and as set forth above, Plaintiff was in contract negotiations with prospective third parties to provide audio engineering services to those third parties.

55.    Defendant had knowledge of Plaintiff's existing and potential contractual relationships with several of these third parties.

56.    On June 17, 2020, ProSoundWeb published a spoken interview between Plaintiff (identified as "Michael"), Defendant, and Jamie Anderson, the President of Rational Acoustics, in which they discussed Plaintiff's work.

57.    One of Plaintiff's primary areas of work and responsibility with Rational Acoustics was research and development for their sound level monitoring software application called Smaart SPL. Plaintiff also provided technical writing and editing

work, for which he earned the in-jest job title of "Hyphen Wrangler."

58.    The audio recording is available at the following URL, retrieved 3/25/2025:    https://signaltonoisepod.buzzsprout.com/748181/episodes/4205894-53-jamie-anderson-rational-acoustics.

59.    The following statements, transcribed at the included timestamps, establish that Defendant Leonard was aware of Plaintiff's work and contractual relationships with third parties, including Rational Acoustics, knew Plaintiff's job title, knew Plaintiff's major responsibilities, including R&D and writing the software's technical documentation, was an active participant in two publicly available hour-long interviews in which Plaintiff's working relationship with Rational was discussed, and that he met Plaintiff through testing an early ("beta") version of the software program:

1:09m

Lombardo: I just noticed there's a typo on your bio on the [Rational Acoustics] website, Jamie, I will get that fixed tomorrow.

Leonard: Come on, Hyphen Wrangler.

1:45m

Lombardo: And I was just looking at my calendar, Jamie, I think it's been almost exactly a year ago that I joined the Rational family -

Anderson: And a bit has happened since you joined.

3m30s

Lombardo: (to Leonard) You're one of our beta testers for the new SPL features in Smaart so I'll let you dive in.

Leonard: It's been fun. It's kind of somewhat how Michael and I got introduced, is through the beta testing of SPL. Probably almost a year ago, Michael, like you said, that you've gotten in with Rational.

9m00s

Anderson: Throughout my career, there's been this thing in the background where people are trying to monitor it and put rules out there to try and get on it. With Michael, we kind of went through looking at this, like why do people measure SPL[…]

10m47s

Anderson: I had the pleasure of working with Michael at a USITT event where we were playing sound police.

15m23s

[In the context of research into whether Rational Acoustics should offer dedicated hardware for their software product]

Anderson: Michael was doing some absolutely crazy stuff going and getting these handheld SPL meters that you can buy, and how accurate they weren't.

18m15s

Anderson: I think I said this to you earlier today, Michael, but the thing that hits me about it just because we've put so much energy into the SPL project is that

it was really important until 3 months ago [referencing Covid quarantine].

Leonard: Yeah.

20m35s

Lombardo: Pretty much as soon as we started working on SPL, I started taking the rig to every show I worked on –

Leonard: mhmm

22m38s

Anderson: So you're only allowed to be exposed to, what is it, one hour at 94 dB SPL? I forget what the numbers are.

 Leonard: That's why you have Michael! Michael, what's the answer to that?

1h02m40s

Anderson: One of the reasons for adding Michael in to the mix was about – if we've got Smaart, and DI, and SPL, you need a product manager, somebody that can look at what the requirements are, what people need, and also get the feedback, you have to have somebody paying attention to the market and to the standards, and standard practices, and talking with the people that are doing it.

 Like for Smaart, that used to be me, for many, many years, and […] we have Chris Tsanjoures doing product management [for Smaart], and it's his job to monitor all that stuff, and it's really not possible to have any of these products without a product manager, a person who's specifically looking and interacting with the people using the product and getting that feedback. That's

absolutely critical. And that's been one of the things that made the product possible. […] When did you first use the SPL program?

Leonard: I think it was like spring of last year, I think. Yeah.

Lombardo: Yeah, it was spring, because I saw what he was doing with his measurements from his church, and I called him, and I was like "we're working on some new stuff, and I want you to try it and tell me what you think" and that's exactly what Jamie's talking about, we need that feedback.

1h14m17s

Leonard: And let's not leave out all the work you guys just – I'll speak as the non-Rational employee here – I wanna thank Jamie, and Chris [Tsanjoures] and Michael and the whole team at Rational – the content that you guys have just been putting out there is insane. […] This industry owes you guys a debt of gratitude for what you guys put out. […]

Lombardo: Well there you go, we don't have to promote anything because you just did it for us.

Anderson: Exactly.

60.    Two years later, on October 12, 2022, ProSoundWeb published a spoken interview between Plaintiff (identified as "Michael"), Defendant Leonard, and Rational Acoustics staff members Jamie Anderson, Chris Tsanjoures and Hannah Goodine.

61.    In this interview, the group discussed the new version 9 release of

Smaart software, including Plaintiff's contributions to the product.

62.    The audio recording is available at the following URL, retrieved on 3/25/2025:    https://www.prosoundweb.com/signal-to-noise-episode-175-rational-acoustics-goes-behind-the-scenes-on-new-smaart-v9/.

63.    The following statements, transcribed at the included timestamps, establish that Defendant Leonard was aware of Plaintiff's work and contractual relationships with third parties, including Rational Acoustics, knew Plaintiff's job title, knew Plaintiff's major responsibilities, including R&D and writing the software's technical documentation, was an active participant in two publicly available hour-long interviews in which Plaintiff's working relationship with Rational was discussed, and that he met Plaintiff through testing an early ("beta") version of the software program:

15m28s

Anderson: [in response to a question from Leonard about development timelines] So the upgrade cycle pays for all the support, it pays for Hannah, it pays for Chris, it pays for Michael, it pays for me, and maybe other people someday as well. […]

I mean, the stuff that Michael "hossed" with SPL and bringing SPL up, that technically was [version] 8, and now we go on from there with 9. So we're kind of in this continuous thing. […]

19m15s

Anderson: One of the things we're rolling on is creating the support materials that go with it [the new software release].

Leonard: Yeah, I incorrectly, on our Discord, told someone, "yeah, read the manual, Michael wrote it," because I knew Michael was writing it, right? But Michael was like "Uh, that's not out yet," and I was like, ah shit, okay.

31m42s

Anderson: [in response to Leonard's question about new features] I'm gonna guess, I don't know, maybe we get sixty percent of that, because something else is going to come up. Michael is going to be somewhere, in the middle of loading in a show, and come back and go "We need this, we need this, we need this."

42m09s

Lombardo: I was at this show and the system engineer […] was trying to set up an SPL meter and he didn't know how to do that. So I was just watching him from a distance, seeing which menus he's looking in, and that's gold from a product management standpoint. I want to see where he thinks that button should be. […]

So that's something that I think was a huge focus, and will continue to be a huge focus in version nine, is that we have a good idea of mathematically what this tool is capable of, but like Jamie said, we use this all day every day –

Anderson: Yep.

Lombardo: What about the people who are going to use it for twenty minutes twice a week as a larger set of duties, and how do you make it intuitive for them?

64.    On September 11, 2022 Defendant posted on the Signal to Noise discord server further evidence that he knew similar details about the nature of Plaintiff's work with Ghost, the band that is the client of RSE named above.

65.    A screenshot of Defendant's post is as follows:



66.    Defendant's actions in repeating his defamatory statements of and concerning Plaintiff on multiple occasions to persons in Plaintiff's industry and with whom he worked demonstrates that he intended to harm Plaintiff's existing and/or prospective contractual relationships with third parties and did so without privilege or justification.

67.    As a result of Defendant's actions these third parties terminated their contractual relationships and potential contractual relationships with Plaintiff, and as

a result of those terminations, Plaintiff suffered significant financial injury and damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief as against Defendant:

(a)     As to Count I (Defamation *Per Se*), presumed damages in an amount in excess of $75,000, together with punitive damages;

(b)     As to Counts II and III, actual damages in an amount in excess of $75,000, together with punitive damages; and

(c)     The costs of this action, together with such other relief as the Court may deem just and proper here.

Dated: April 8, 2025                      Respectfully submitted,

_____

Alan J. Pierce

HANCOCK ESTABROOK LLP
100 Madison St., Suite 1800
Syracuse, NY 13202
315-565-4546
apierce@hancocklaw.com

Jacob C. Lehman
PA ID#: 306808
GERMAN GALLAGHER & MURTAGH
The Bellevue, Fifth Floor
200 S Broad St., Suite 500
Philadelphia, PA 19102
215-545-7700
Lehmanj@ggmfirm.com